**Donna J. LINDAHL, Appellant,**

v.

**STATE of Missouri, et al., Respondents.**

No. WD 72555.

Missouri Court of Appeals, Western District.

Nov. 1, 2011.

Application for Transfer to Supreme Court Denied Dec. 20, 2011.

Application for Transfer Denied Jan. 31, 2012.

Rik N. Siro, Siro Smith Dickson P.C., Kansas City, MO, for appellant.

Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, MO, for respondents.

Before Division Two: THOMAS H. NEWTON, Presiding Judge, CYNTHIA L. MARTIN, Judge and GARY D. WITT, Judge.

PER CURIAM:

Donna Lindahl ("Plaintiff") filed suit against the State of Missouri and the Missouri Army National Guard ("Defendant") for sex harassment, sex discrimination, and retaliation pursuant to the Missouri Human Rights Act, section 213.010[1] *et seq.*, as it pertained to her prior employment with Defendant.[2] After a jury trial based solely on Plaintiff's retaliation claim, the jury returned a verdict that awarded Plaintiff no actual damages and $500,000 in punitive damages.

Plaintiff appeals the judgment of the trial court, which granted Defendant's motion for judgment notwithstanding the ver-

---

1. All statutory citations are to RSMo 2000 as updated, unless otherwise indicated.

2. Although the State of Missouri and the Missouri Army National Guard are distinct legal entities, we will refer to them simply as the Defendant for ease of analysis because this Court need not be concerned with their separate identities on appeal in light of the fact that the parties stipulated at trial that the defendants "are one and the same."

dict on the basis that "[n]o punitive damages can be awarded since there was no award of actual damages by the jury." Plaintiff also appeals the trial court's judgment that, *inter alia*, denied Plaintiff's motion for new trial.

The cause is reversed and remanded.

### Factual Background[3]

Beginning in 1999, Plaintiff was a civilian custodial worker at the Missouri National Guard Armory located on Whiteman Air Force Base in Knob Noster, Missouri. On February 18, 2004, Plaintiff notified military police on Whiteman Air Force Base of sexual harassment by Sgt. Mike Lewis, a soldier that was then stationed at the Armory but was never Plaintiff's supervisor. Plaintiff reported that over a fifteen month period, beginning in August 2002 through November 2003, Sgt. Lewis sexually harassed Plaintiff on multiple occasions at the Armory where she worked. Defendant did not dispute at trial that Sgt. Lewis engaged in reprehensible conduct.[4]

Specifically, the incidents began with Sgt. Lewis stopping by the Plaintiff's office and commenting on a poster depicting a muscular man wrapped in a large American flag. Sgt. Lewis repeatedly joked that he was the man in the photo, and asked Plaintiff when she was going to re-take this photo. Eventually, Plaintiff, an amateur photographer, consented to taking photographs of Sgt. Lewis, which led to Sgt. Lewis being photographed naked holding a small flag on a stick in front of his penis.

Over time, these incidents became even more aggressive, with Sgt. Lewis flashing his penis at Plaintiff without notice. On two occasions, Sgt. Lewis lured Plaintiff into a secluded location, blocked her avenue of escape and exposed himself so that Plaintiff could see his erect penis, and then began to masturbate.

In 2005, Plaintiff filed the instant lawsuit against Defendant in the Circuit Court of Johnson County, which alleged claims of sex harassment, sex discrimination, and retaliation pursuant to the Missouri Human Rights Act ("MHRA"), sections 213.010–213.137. Prior to trial, Plaintiff made a strategic decision to proceed only on the retaliation claim against the Defendant.

The jury heard evidence that Plaintiff had reported the sexual harassment by Sgt. Lewis to Plaintiff's immediate supervisor at the time, Sgt. Carla Caldwell. However, it was disputed at trial as to when the actions of Sgt. Lewis were discovered by other individuals within the Defendant's chain of command, and why the Defendant did not take concrete action based on this information.

Plaintiff presented evidence that she was retaliated against by the Defendant in numerous ways after reporting the incidents by Sgt. Lewis to the civilian police. Specifically, Plaintiff claimed that she suffered lost wages as a result of a one month suspension from work after her report to the civilian police,[5] and that she also suf-

---

**3.** Because of our limited scope of review on appeal on the issues presented, this Court need not attempt to outline in detail the bulk of the evidence that was adduced at trial. Rather, the Court only outlines the information necessary in order to resolve the pertinent issues on appeal. Many factual issues remain in dispute by the parties; however, we need not resolve these issues based on our standard of review as outlined herein.

**4.** Based on his conduct, Sgt. Lewis was demoted and transferred, suffering a significant reduction in pay and retirement.

**5.** Defendant alleged that this suspension was based on Plaintiff's own actions in proceeding

fered a pay differential that she claimed Defendant imposed as retaliation in restricting her hours after she reported this conduct. Plaintiff also claimed that the Defendant changed some of her job duties as retaliation after she reported the incidents. Two examples include: (1) Plaintiff was no longer allowed to collect the materials for recycling on the Armory because that position was re-assigned to military personnel; and (2) Plaintiff was directed "to stop burnishing the drill floor, a great source of pride to plaintiff, and allow it to return to concrete."

Plaintiff testified that after she reported the incidents, her existing work environment also deteriorated because of individual conduct at the Armory that the Defendant did not prevent. One example of such conduct is that Plaintiff would find pornographic magazines in the male bunk room following drill weekends.

Plaintiff also presented evidence that her new direct supervisor, Sgt. Beck, did not personally like the Plaintiff. Sgt. Beck was assigned as her supervisor after her report of the incidents.[6] Plaintiff presented evidence that Sgt. Beck secretly videotaped Plaintiff mowing a lawn while on workers' compensation leave in an attempt to have Plaintiff punished. Plaintiff was never charged with any workers' compensation fraud.

Plaintiff further testified that she suffered emotional damages as the result of Defendant's alleged illegal retaliation. For example, Plaintiff testified that she had "trouble sleeping and eating."[7]

At the conclusion of trial, Plaintiff asked the jury to return a verdict in favor of Plaintiff. In addition to the evidence of lost income of $12,549.59, Plaintiff's trial counsel also suggested that the jury award $250,000.00 in actual damages for Plaintiff's "pain and suffering." Finally, Plaintiff argued that the jury should award punitive damages to Plaintiff "to send the message that this kind of conduct in an organization can't be tolerated."

The jury returned a verdict finding no actual damages, but assessing $500,000 in punitive damages in favor of Plaintiff. The trial court entered a written judgment consistent with the jury's verdict.

Defendant subsequently filed a motion for judgment notwithstanding the verdict, which the trial court granted on the basis that the punitive damage award could not stand as a matter of law, without a finding of actual damages. Plaintiff also filed, *inter alia*, a motion for new trial, and the trial court denied Plaintiff's post-trial motions.

Plaintiff now appeals, bringing four Points.

Further facts will be outlined as relevant in the analysis section below.

### Analysis

In Point One, Plaintiff argues that the "trial court erred in granting the Defendants' judgment notwithstanding the verdict because Plaintiff made a submissible case on retaliation and punitive damages under the [MHRA] ... and the language of the [MHRA] does not require an award

---

to actually take semi-nude photographs of Sgt. Lewis on military property.

**6.** There was no evidence that this assignment was in any way influenced by the incidents she reported.

**7.** In 2009, Plaintiff was discharged by the Defendant because of a "budget crisis"; however, Plaintiff has never claimed that her discharge by Defendant was retaliatory in light of the fact that "many ... positions were eliminated."

of actual damages to support punitive damages."

■ "We review a trial court's grant of a motion for JNOV *de novo.*" *Koppe v. Campbell,* 318 S.W.3d 233, 239 (Mo.App. W.D.2010). "We view the evidence in the light most favorable to the jury's verdict, and give the prevailing party all reasonable inferences from the verdict while disregarding the unfavorable evidence." *Id.* (citing *Hodges v. City of St. Louis,* 217 S.W.3d 278, 280 (Mo. banc 2007)). "A presumption exists favoring the reversal of a JNOV." *Kinetic Energy Dev. Corp. v. Trigen Energy Corp.,* 22 S.W.3d 691, 697 (Mo.App. W.D.1999).

■ In granting the JNOV, the trial court found that "[n]o punitive damages can be awarded since there was no award of actual damages by the jury." It is undisputed on appeal that "Missouri follows the general rule that no punitive damages can be awarded absent an award of actual or nominal damages." *Williams v. Williams,* 99 S.W.3d 552, 556 (Mo.App. W.D.2003) (citations omitted). "Nominal damages are significant because such a judgement(sic) determines the right to receive costs, as well as an award of punitive damages." *Clark v. Beverly Enterprises–Missouri, Inc.,* 872 S.W.2d 522, 527 (Mo. App. W.D.1994). We thus reject Plaintiff's argument that the MHRA permits an award of punitive damages without an award of actual damages. The common law must apply to the MHRA " 'unless a statute clearly abrogates the common law either expressly or by necessary implication.' " *Wiley v. Homfeld,* 307 S.W.3d 145, 149 (Mo.App. W.D.2009) (quoting *Mika v. Cent. Bank of Kansas City,* 112 S.W.3d 82, 90 (Mo.App. W.D.2003)). "[T]he Legislature is presumed to have acted with full awareness and complete knowledge of the present state of the law, including judicial and legislative precedent." *Rozelle v. Ro-*

*zelle,* 320 S.W.3d 225, 229 (Mo.App. E.D. 2010) (quotation omitted). Indeed, in concluding that punitive damages could be assessed against a city under the MHRA, the Missouri Supreme Court just recently relied on the fact that the legislature did not clarify a different interpretation than established by common law in that context. *See Howard v. City of Kansas City,* 332 S.W.3d 772, 788 (Mo. banc 2011) (*"Because the Missouri General Assembly has not amended or clarified the MHRA in the face of our court of appeals decisions authorizing punitive damages against political subdivisions* and because the Missouri General Assembly included the phrase 'the state, or any political or civil subdivision' in the definition of 'employer' in § 213.010, it is clear the legislature intended to treat the state and its subdivisions in the same manner as it treats other employers.").

Though we do not conclude that the MHRA permits an award of punitive damages without an award of actual damages as argued by Plaintiff, our inquiry into the inconsistent verdict entered by the jury in this case is not complete.

■ "By awarding [plaintiff] punitive damages but not actual damages, the jury returned an inconsistent verdict," and "the rule in Missouri is that a claim that a verdict is inconsistent to the point of being self-destructive must be presented to the trial court before the jury is discharged or that claim is waived." *Blue v. Harrah's North Kansas City, LLC,* 170 S.W.3d 466, 474 (Mo.App. W.D.2005). When an inconsistent verdict is returned by the jury in this context, "the burden was on [Plaintiff] to ask the court to instruct the jury to award him nominal damages if it did not find that he suffered actual damages, and he failed to do so." *Id.* at 474–75. "The law is very clear that [plaintiff's] failure to raise that problem before the jury was

discharged means that he has waived that claim." *Id.* at 475 (citations omitted).

■ After the jury's verdict was announced but before the jury was dismissed, a bench conference was held outside the presence of the jury regarding the troubling nature of the jury's verdict. At that time, it is clear the trial court was unsure of how to proceed and discussed the possibility of "send[ing] them back in with some kind of instruction." Plaintiff's trial counsel concurred with the trial court, stating the following:

> My preference would be to advise them that they—that this is an inconsistent verdict, that either there has to be actual and punitive or none all the way around. I think that with an instruction they may come back with none for everything, but I think that that makes more sense.

After plaintiff's counsel stated his preference that the trial court should further instruct the jury so as to avoid an inconsistent verdict, defense counsel made the following statements:

> MR. BRUCE [Defense counsel]: *I don't think there is anything inconsistent about it,* Your Honor. I mean, they said that there were no actual damages.
>
> THE COURT: How can we—I am just—I am a little stumped myself. I mean, there are not actual damages but there are punitive damages.
>
> MR. SIRO [Plaintiff's counsel]: And there is no instruction that talks about—
>
> THE COURT: I have never seen—
>
> MR. SIRO: *To me, that is an inconsistent verdict.*
>
> MR. BRUCE: The funny thing is that the punitive damages instruction, Number 5, does not require them to find actuals to get punitive. *I don't know if*

*that is right or not.* You know, that's— I know in federal court that that is a requirement and it is set out in an instruction.

> THE COURT: But your opinion is, it just is what it is.
>
> MR. BRUCE: *Yeah. I mean, I think we just have to deal with it.* I think they followed the instructions.

Tr. 636–37 (emphasis added).

In light of this discussion, and undoubtedly influenced by the State's representations that it did not believe the verdict to be inconsistent, the trial court accepted the jury's verdict, and discharged the jury. Thereafter, when given the opportunity to consider *Blue* as a part of the State's motion for JNOV, the trial court correctly concluded that the jury's verdict was indeed inconsistent. At this juncture, however, the principles of equity necessitated the award of a new trial to the Plaintiff, and not the granting of the State's request for JNOV. Plaintiff timely brought the inconsistent verdict to the trial court's consideration and requested that the jury be further instructed and permitted to further deliberate in order to ameliorate the inconsistent verdict in a manner sufficient to preserve the issue pursuant to *Blue.* Though neither party advised the trial court about the holding in *Blue* before the jury was discharged, it would defy both logic and equity to deprive Plaintiff of the relief *Blue* authorizes and which Plaintiff timely requested (additional instructions to a jury to remediate an inconsistent verdict). This is particularly so where the State diverted the trial court from affording the jury the opportunity to remediate the inconsistency by arguing at trial that the verdict was not inconsistent—a position which is diametrically opposed by the State's motion for JNOV.[8]

8.  As pointed out by Plaintiff, "Defendant's    counsel did not mention the *Blue v. Harrah's*

Rule 84.14 provides that "the appellate court shall award a new trial or partial new trial, reverse, or affirm the judgment or order of the trial court, in whole or in part, or give such judgment as the court ought to give. Unless justice otherwise requires, the court shall dispose finally of the case." "Rule 84.14 permits us to enter the judgment that the trial court ought to give, and unless justice otherwise requires, we shall dispose finally of the case." *In re Estate of A.T.*, 327 S.W.3d 1, 3–4 (Mo.App. E.D.2010).

▋ As outlined above, there can be no doubt that Lindahl's attorney requested that the jury be instructed to deliberate further in light of its inconsistent verdict. As a matter of law, Lindahl was entitled to that relief at that time. "If the verdict is ambiguous, inconsistent or otherwise defective the jury should be given an opportunity to correct it or find a new one before the verdict is recorded and made a

part of the judgment." *Parker v. Midwestern Distribution, Inc.*, 797 S.W.2d 721, 725 (Mo.App. E.D.1990). "When a trial court sends a jury back for further deliberations because it has returned inconsistent verdicts, MAI 2.06 applies." *Braboy v. Federal Express Corp.*, 238 S.W.3d 690, 697, fn. 8 (Mo.App. E.D.2007) (quoting *Franklin v. Allstate Ins. Co.*, 985 S.W.2d 893, 896 (Mo.App. W.D.1999));[9] *see also Fincher v. Murphy*, 825 S.W.2d 890, 893 (Mo.App. W.D.1992) (holding that when "the [jury's] verdicts are inconsistent, ... further deliberation with MAI 2.06" are proper after attorney "suggested the inconsistency to the court."); *Parker v. Midwestern Distribution, Inc.*, 797 S.W.2d 721, 726 (Mo.App. E.D.1990) ("The trial court, having found an ambiguity, reinstructed the jury as provided for in MAI [2.06] and returned it for further deliberations. Only after such further deliberations and a new verdict did the court accept the verdict.

case to the Court or plaintiff's counsel before the Court discharged the jury, *nor did he mention that he had represented one of the defendants in that case.*" (Emphasis added.) Defense counsel, for the first time at oral argument on appeal acknowledged that he was aware of and considered the holding in *Blue* at the time he urged the trial court to accept the jury's inconsistent verdict and discharge the jury. Counsel did make a nonsensical and semantical argument that he did not believe the jury's verdict in this case was an "inconsistent verdict," but still urged this court to apply the holding in *Blue* which was premised upon the fact a verdict of this nature is inconsistent. However, he has offered no explanation as to why he affirmatively represented to the trial court that if the court accepted the verdict and if there was a problem with it that they could deal with it later. Clearly, *Blue* holds that once the jury is discharged, a verdict of this nature cannot stand. Counsel has not afforded us a satisfactory explanation as to how he could have plausibly made such an argument as it pertains to this controlling case precedent in light of the fact that he was one of the primary litigants before

the trial court and this Court in *Blue*. Section 4–3.3(a)(2) of the Rules of Professional Conduct requires that a lawyer shall not knowingly, "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel."

9. MAI 2.06, last revised in 2006, pertains to "Inconsistent or Erroneous Verdict," and states that the jury should be further instructed as follows:

The court cannot accept your verdict[s] as written because (here insert a brief description why the verdict(s) is (are) inconsistent, incomplete, ambiguous, or otherwise erroneous.) [A][N]ew verdict form[s] is [are] attached for your use, if needed. Do not destroy any of the verdict forms.

The Notes on Use also state: "This instruction may be given if the jury attempts to return an inconsistent, incomplete, ambiguous or otherwise erroneous verdict. The court should identify each of the new verdict forms submitted with this instruction with an appropriate designation such as 'Second Set.'"

The trial court's procedure was correct and we find no error.").

Ultimately, Plaintiff was not required to request that the jury be instructed on nominal damages as discussed in *Blue*, but rather was entitled, for the reasons explained above, to have the jury further instructed pursuant to MAI 2.06. We do not know, if the jury had been further instructed via instruction MAI 2.06, what the jury would have been done with such an instruction. *See Braboy*, 238 S.W.3d at 697 ("[W]e find the verdict received is so contradictory that it cannot fairly be resolved as a definite finding in favor of either party. Thus, we hold the verdict is inconsistent and a nullity, incapable of supporting the entry of any judgment."). Therefore, we conclude that this matter must be remanded for a new trial on all issues. We cannot fault the trial court for concluding that its only option following consideration of the State's motion for JNOV was to grant JNOV in light of our holding in *Blue*. It is, indeed, unusual to award a non-movant relief in the form of a new trial in response to a movant's motion for JNOV. However, our inherent equitable power permits us to remediate the predicament the trial court faced by effectively affording Plaintiff the relief Plaintiff would have received before the jury was discharged but for the State's suspect argument that the jury's verdict was not inconsistent.

■ Alternatively, Defendant argues (in what is labeled as Defendant's Fifth Point Relied On) that the "trial court did not err in granting a judgment notwithstanding the verdict in favor of Respondent because the National Guard is immune from suit under the *Feres* doctrine in that [Plaintiff's] lawsuit asked the civilian courts to interfere in the operation of military, which is prohibited by the United State Constitution." Prior to trial, Defen-

dant filed a motion for summary judgment, in which Defendant sought dismissal of Plaintiff's lawsuit on the basis of the *Feres* doctrine. The trial court denied the motion for summary judgment.

The Eighth Circuit outlined the applicable scope of the Feres doctrine in the following passage:

> In *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Supreme Court held that members of the armed forces who sustained injury while on duty due to the negligence of other servicemembers or the military itself could not sue the United States . . . In a later case, *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Supreme Court further articulated the policy basis of *Feres* and its progeny. Underlying *Feres* was a recognition of "the peculiar and special relationship of the soldier to his superiors, [and] the effects on the maintenance of [FTCA] suits on discipline." *Id.* at 299, 103 S.Ct. 2362 (quoting *United States v. Muniz*, 374 U.S. 150, 162, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (internal quotation marks omitted)). The Court counseled that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the Military Establishment." *Id.* at 300, 103 S.Ct. 2362. . . .

The courts of appeals have extended *Feres* to encompass Title VII claims by servicemembers against the military. **While the text of Title VII makes its strictures applicable to "employees . . . in military departments," 42 U.S.C. § 2000e–16(a), that provision has generally been interpreted to ap-**

ply only to civilian employees of the armed forces. *Johnson v. Alexander,* 572 F.2d 1219, 1224 (8th Cir.1978) ("[N]either Title VII nor its standards are applicable to persons who enlist or apply for enlistment in any of the armed forces of the United States."); *see also* 29 C.F.R. § 1614.103(d)(1) (EEOC regulation noting that Title VII applies to "military departments," but not to "[u]niformed members of the military departments"). Thus, as a general rule, the Feres doctrine precludes claims brought by servicemembers under Title VII arising out of activities that are incident to military service. *See Hupp v. U.S. Dep't of the Army,* 144 F.3d 1144, 1147 (8th Cir.1998); *see also, Overton v. N.Y. State Div. of Military and Naval Affairs,* 373 F.3d 83, 89 (2d Cir. 2004); *Brown v. United States,* 227 F.3d 295, 299 (5th Cir.2000); *Mier v. Owens,* 57 F.3d 747, 749–50 (9th Cir.1995). The Feres doctrine also generally applies to members of the National Guard, as well as members of the regular military. *Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 667 n. 1, 672, 673–74, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) (applying *Feres* to block a third-party indemnity claim against the United States over the death of a National Guard officer); *see also Hupp,* 144 F.3d at 1147.

*Wetherill v. Geren,* 616 F.3d 789, 792–94 (8th Cir.2010) (emphasis added).

██ Because Plaintiff was undisputedly a civilian employee of the Defendant, we need not be detained by Defendant's argument that it is immune from suit under the *Feres* doctrine. Simply put, Defendant has failed to meaningfully distinguish caselaw that assists our interpretation of MHRA in this context in lieu of the fact that it is undisputed that there is no Missouri case dealing with the application of the *Feres* doctrine to the Missouri National Guard. "In deciding a case under the MHRA, appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." *Daugherty v. City of Maryland Heights,* 231 S.W.3d 814, 818 (Mo. banc 2007).

"There is no question that Congress intended for § 717(a) [of Title VII] to afford protection against discrimination to civilian employees and applicants for civilian employment in the Departments of the Army, Navy and Air Force." *Johnson v. Alexander,* 572 F.2d 1219, 1224 (8th Cir.1978); *see also In re Complaint Of Vulcan Materials Co. v. Massiah,* 645 F.3d 249, 265 (4th Cir.2011) ("In its most recent decision applying the Feres–Stencel Aero doctrine, the Court reiterated that the concern for interference with military discipline lies 'at the heart of the Feres doctrine' and distinguishes suits brought against the United States by servicemembers injured in the course of military service from those brought by civilian employees.").

Defendant argues on appeal that while caselaw indicates the *Feres* doctrine initially applied only to military employees, the immunity has been extended to civilian employees of the government because they play an integral role in military functions. But Defendant cites no caselaw wherein a civilian employee was precluded from bringing a Title VII suit against the government based on the *Feres* doctrine.

Therefore, we conclude that the trial court did not err in concluding that the *Feres* doctrine was inapplicable to Plaintiff's lawsuit, and thus Defendant's JNOV motion cannot be sustained on this basis.

██ For all of these reasons, Plaintiff's First Point is granted insofar as it alleges that JNOV should not have been granted.[10]

## Point II

In Point Two, Plaintiff argues that the trial court erred in denying Plaintiff's motion for new trial. Based on our holding under Point I, this Point is now moot.

## Conclusion

The judgment of the circuit court is reversed and the cause remanded for a new trial on all issues.

---

**10.** In Points Three and Four, Plaintiff argues that the trial court erred in denying her motion for attorney's fees and her motion for injunctive and equitable relief. On remand, the trial court may enter a judgment pertaining to these matters consistent with this opinion if the Plaintiff is the prevailing party pursuant to Missouri law upon the retrial of this matter. "A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing suit." *Alhalabi v. Missouri Dept. of Natural Resources*, 300 S.W.3d 518, 530 (Mo.App. E.D.2009). However, because Plaintiff is no longer employed by Defendant, we are dubious that she is entitled to injunc-

tive and/or equitable relief pursuant to MHRA. But we need not resolve that specific issue since this matter must be remanded. Further, Plaintiff filed a motion for attorney's fees and costs on this appeal, which we took with the case. The MHRA authorizes the trial court "to award court costs and reasonable attorney's fees to the prevailing party." Section 213.111. Because this matter is being remanded for a new trial, the motion is denied without prejudice to Plaintiff's right to seek attorney's fees, including fees and costs on this appeal, in the event of recovery on the merits. *See Francin v. Mosby, Inc.*, 248 S.W.3d 619, 624 (Mo.App. E.D.2008).