

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION THREE</u>

| | | |
|---|---|---|
| C.H., | ) | |
| | ) | No. ED111405 |
| and | ) | |
| | ) | |
| S.S., | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| Appellants, | ) | Cause No. 19SL-CC04403 |
| | ) | |
| v. | ) | Honorable David L. Vincent III |
| | ) | |
| INFERTILITY CENTER OF | ) | |
| SAINT LOUIS, et al., | ) | Filed: September 26, 2023 |
| | ) | |
| Respondents. | ) | |

<u>Introduction</u>

This matter involves the trial court's grant of summary judgment in favor of

Sherman J. Silber, M.D., (Dr. Silber) and St. Luke's Episcopal-Presbyterian (St. Luke's)

(collectively, Respondents) after C.H. and S.S. (Appellants) failed to file their medical

malpractice claim within the two-year period from the date of the negligent occurrence

required by Section 516.105, RSMo. 2018.[1]   Appellants assert that the trial court

improperly granted summary judgment against them because this case falls under Section

516.105.1(2), an exception to the statute's two-year filing requirement, stemming from

---

[1] All statutory references are to RSMo. 2018 unless otherwise indicated.

1

Respondents' negligent failure to inform C.H. of his 2010 sperm motility test result, which Appellants did not discover until 2018. Respondents assert that no malpractice occurred, the claims were time-barred by Section 516.105, and Appellants should have known or had reason to know Dr. Silber used a prior frozen sample not belonging to C.H. for in vitro fertilization (IVF). We affirm the trial court's grant of summary judgment as the record demonstrates the uncontroverted material facts negate Appellants' claim that Respondents caused them damages.

Background

In 2009, C.H. (Husband) and P.H. (Wife), who were married at the time, sought treatment from Respondents for IVF and an embryo transplant into a surrogate, whereby Husband and Wife would be the biological parents of the child. Husband and Wife entered into a surrogacy agreement with S.S. (Surrogate), who agreed to give birth to their baby.

On October 23, 2009, Wife delivered a semen sample purportedly belonging to Husband to St. Luke's. In November of 2009, and again in February of 2010, Dr. Silber fertilized three eggs from Wife with the semen sample she had provided. However, the semen sample Dr. Silber used to fertilize the eggs belonged to Wife's paramour, rather than Husband.

Dr. Silber met with Husband and Wife on November 6, 2009 and February 2, 2010, and with Husband, Wife, and Surrogate on March 11, 2010. During these meetings, Dr. Silber explained that he created three embryos in November of 2009 and an additional three embryos in February of 2010 utilizing the previously frozen sperm Wife provided in October of 2009. That same day, Husband and Wife made clear their desire to transfer the February 2010 embryos into Surrogate at the first opportunity.

2

Appellants allege that sometime in March of 2010, Husband provided his own semen sample at the request of Respondents. Appellants claim Dr. Silber deemed Husband's March 2010 sample unusable for fertilization due to low motility after testing it at his St. Luke's laboratory, but Dr. Silber never informed Husband. Husband further disputes ever being informed of his motility test result despite Wife's statements that St. Luke's called her to discuss his March 2010 result.[2] In July of 2010, Dr. Silber transferred a fertilized embryo he froze in February of 2010 into Surrogate, who later gave birth to a baby boy.

In 2011, Husband and Wife retained the services of a Tennessee attorney and filed a petition to establish parentage and custody against Surrogate, fearing Surrogate would not give up the baby at birth. The petition drafted by Husband's attorney incorporated by reference a statement made by Dr. Silber under oath that provided, "in October 2009, [Husband]'s sperm was produced and then frozen at St. Luke's to be used for all IVF procedures" and that "an embryo fertilized and frozen in February 2010 using [Husband]'s October 2009 frozen sperm sample was transferred into [Surrogate] on July 23, 2010." Both Husband, in two sworn statements, and Surrogate, in verified interrogatory answers, confirmed the information set forth in the petition to be true and accurate. Furthermore, Husband's attorney approved and Surrogate accepted the Tennessee court's March 10, 2011 order granting custody of the child to Husband and Wife.

---

[2] These facts are disputed in the record. Appellants offered emails between Wife and a nurse at St. Luke's making arrangements for Husband to give a sample in March of 2010, and the deposition testimony of Wife in which she said she received a phone call with Husband's motility test results and informed Husband. Respondents offered Dr. Silber's deposition testimony, in which he stated neither he nor St. Lukes have a record of a March 2010 sample from Husband or any test performed on it.

On February 8, 2017, Husband signed an Authorization to Dispose of Frozen Sperm before a notary that requested "St. Luke's Hospital [to] dispose of any sperm being kept frozen by Dr. Sherman J. Silber from October 23, 2009, but not ultimately used."

On October 1, 2019, Husband and Surrogate filed a medical malpractice action against Dr. Silber and St. Luke's. Husband and Surrogate claimed that in 2018, they became aware of the test result that deemed Husband's sperm as having low motility and unusable for fertilization. Thus, they alleged that Respondents were negligent in providing IVF treatment using sperm that was not Husband's between 2009 and 2010.

The petition alleged twelve duties breached by Respondents. These included failing to act in a manner consistent with professional standards, failing to adequately label, transport, handle, and identify genetic material, allowing a third party to drop off genetic material without confirming it belonged to Husband, using a third party's genetic material, and failing to report Husband's sperm motility test result. As a result, Appellants alleged Husband wrongly believed that his son shared his genetic identity, and Surrogate became impregnated with genetic material she did not consent to carry, causing them to suffer mental anguish requiring rehabilitative care.

Respondents moved for summary judgment, arguing the claims were time-barred by Section 516.105, no malpractice occurred, and that Husband and Surrogate should have known or had reason to know Dr. Silber used a prior frozen semen sample, which was not Husband's, to create the embryos. The trial court granted summary judgment in favor of Respondents. This appeal follows.

4

We review the trial court's entry of summary judgment *de novo* and view the record in the light most favorable to the non-moving party. Copeland v. Wicks, 468 S.W.3d 886, 889 (Mo. banc 2015). Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. Walsh v. City of Kansas, 481 S.W.3d 97, 106 (Mo. App. W.D. 2007). Summary judgment is appropriate when a moving party shows there are no genuine issues of material fact and the party is entitled to judgment as a matter of law. Kivland v. Columbia Orthopaedic Group, LLP, 331 S.W.3d 299, 304 (Mo. banc 2011). A defending party may establish a right to judgment, as a matter of law, by showing facts that negate any element of the claimant's cause of action. Lisle v. Meyer Elec. Co. Inc., 667 S.W.3d 100, 103 (Mo. banc 2023). We will affirm summary judgment "by any appropriate theory supported by the record." Columbia Cas. Co. v. HIAR Holding, L.L.C., 411 S.W.3d 258, 264 (Mo. banc 2013).

Discussion

Appellants' appeal involves only their malpractice claim that Respondents negligently failed to inform Husband[3] of his March 2010 motility test result. In their sole point on appeal, Appellants argue that the trial court erred in granting summary judgment against them because Appellants did not discover Respondents' failure to inform Husband

_____

[3] Appellants' petition includes the repeated allegation that Respondents "negligently and carelessly failed to report test results to [Husband] and [Surrogate]," but Appellants clarify in their reply brief on appeal that Surrogate's claimed damages in this particular point on appeal result from Respondents' failure to report the sperm motility test result at issue to Husband, which aligns with the statutory language of Section 516.104.1(2) regarding "negligent failure to inform *the patient* of the results of medical tests" (emphasis added). Surrogate does not argue that she had any separate right to be informed of Husband's sperm motility test results or that Respondents breached a duty to inform her of this particular test result. Thus, we discuss the failure to inform of the sperm motility test result here only as it relates to Husband.

of his March 2010 motility test result until 2018, thus Appellants timely filed suit within the exception to the two-year limitations period provided in Section 516.105.1(2).[4] We find that even if we assume Appellants' suit was so timely filed, summary judgment was nevertheless appropriate because the uncontroverted material facts negate Appellants' claim that Respondents' failure to inform Husband of his motility test result caused the damages they allege.

To survive summary judgment, Husband and Surrogate must present facts supporting a finding that Respondents' failure to inform Husband of his sperm motility test result was the cause-in-fact and the proximate cause of their damages. Ploch v. Hamai, 213 S.W.3d 135, 141 (Mo. App. E.D. 2006), see also Roberts v. BJC Health System, 391 S.W.3d 433, 438 (Mo. banc 2013) (holding summary judgment in favor of defendants warranted when plaintiffs fail to establish damages). Appellants have failed to do so here.

On appeal, Appellants focus on only one of the twelve alleged acts of Respondents' negligence: failure to inform Husband that his sperm had low motility and therefore could not be used successfully for IVF.[5] The damages Husband and Surrogate allege they suffered as a result of not being informed of Husband's March 2010 test result stem from their unawareness that the genetic material used for the IVF process belonged to another man.

---

[4] Section 516.105.1(2) states as follows:

> In cases in which the act of neglect complained of is the negligent failure to inform the patient of the results of medical tests, the action for failure to inform shall be brought within two years from the date of the discovery of such alleged negligent failure to inform, or from the date on which the patient in the exercise of ordinary care should have discovered such alleged negligent failure to inform, whichever date first occurs[.]

[5] Respondents dispute the claim that low motility would have rendered the sperm unusable given that Dr. Silber used intracytoplasmic sperm injection (ICSI) to fertilize Wife's eggs, a process that allegedly renders sperm motility irrelevant.

However, the uncontroverted material facts in the record make clear that Husband was provided ample opportunity apart from the motility test result at issue to know the semen sample used to fertilize the embryo transferred to Surrogate did not belong to Husband, most notably, Husband's petition to establish parentage in Tennessee incorporating Dr. Silber's sworn statements that he used the October 2009 sample provided by Wife. Under these particular and unusual circumstances, the uncontroverted material facts negate the fact that Appellants did not know Dr. Silber used another man's sperm to create the embryo transferred to Surrogate, the linchpin of their claim for damages. See Lisle, 667 S.W.3d at 103 (defendant may establish right to summary judgement by showing facts that negate any one of the claimant's elements facts).

Appellants' petition asserts they were "unaware that there was a previous sample" before Husband's March 2010 sample when Dr. Silber created the embryos in 2009 and 2010. Their petition further states, "had [Respondents] informed [Appellants] about [Husband]'s test results, [Appellants] would have known that fertilization using the genetic material of [Husband] would not have been possible because they were unaware of any other frozen sample" and that "had [Respondents] informed [Appellants] about the test results and use of a previous frozen sample, [Appellants] would have known that the genetic material used to fertilize the egg of [Wife] belonged to another man." Their claimed damages resulted from [Husband] "believ[ing]…that his son shared his genetic identity" and [Surrogate] being "impregnated with genetic material she did not consent to carry."

It is undisputed that Dr. Silber met with Husband on November 9, 2009 and February 2, 2010, and with both Husband and Surrogate on March 11, 2010, and informed

7

them that he created embryos in November of 2009 and February of 2010 utilizing the previously frozen sperm Wife provided in October of 2009. The dates Dr. Silber created these embryos precede March of 2010, the date that Appellants acknowledge Husband provided his only sperm sample. Additionally, Husband's statements in the record regarding his March 2010 sample indicate he provided the sample in a medical facility, not that he provided the sample to Wife to be delivered to Dr. Silber. Appellants should have known, or had reason to know Dr. Silber used a sample other than Husband's to create the embryos.[6]

Moreover, a very unique circumstance exists in this case, in that Husband's knowledge of the October 2009 sperm sample is incorporated into a legal document he filed in a court of law. Dr. Silber's sworn statement provided that a "frozen sperm sample from October 2009 was used to create embryos that were later transferred to [Surrogate] as the gestational surrogate on July 23, 2010, resulting in the pregnancy at issue in this case." Husband incorporated this statement into his petition for the Tennessee litigation, and knowledge of the petition's content is imputed to Husband. Cedar Park Dev. LLC, v. Powers, 611 S.W.3d 555, 562 (Mo. App. S.D. 2020). Additionally, both Husband and Surrogate admitted to signing and notarizing testimony upon written interrogatories in

---

[6] Surrogate's claim for damages due to her unawareness that Dr. Silber used another man's sperm to create the embryo here is completely tied to Husband's claim that he was also unaware of the same fact. Her claim for damages assumes that had Husband known of his test result, they both would have known the child was not Husband's. Accordingly, if Husband had reason to know of this mistake regardless of the motility test result, then, as pleaded here, Surrogate did as well. Surrogate raises no separate claim on appeal regarding Respondents' alleged malpractice for failing to inform her that the genetic material she carried was different than that to which she consented. Moreover, due to the fact that Missouri courts have consistently declined to adopt a "discovery" exception to Section 516.105, those who fail to discover instances of medical malpractice not already enumerated in an exception before the two-year statute of limitations runs are still left without an effective remedy under the law as it currently stands. See Davidson v. Lazcano, 204 S.W.3d 213 (Mo. App. E.D. 2006) (discussing history of Section 516.105 and court decisions noting law denies certain injured plaintiffs an effective remedy, which is General Assembly's province, rather than courts', to correct).

which they answered "yes" to the question "[i]s everything your [*sic*] Petition to Establish Parentage true and correct to your information and belief." Husband and Surrogate also admitted that Husband's attorney and Surrogate approved the Tennessee court's final order, which included Dr. Silber's statement as part of the record.

Finally, it is undisputed that the authorization Husband signed before a notary requested St. Luke's to dispose of any sperm being kept frozen by Dr. Silber from October 23, 2009. This further demonstrates Husband should have known or had reason to know of a sample utilized for IVF other than the lone sample he provided in March of 2010.

Thus, even if Appellants' suit occurred within the allowable statutory period in Section 516.105.1.(2), Husband and Surrogate cannot prove that Respondents' failure to inform Husband of his motility test result was the proximate cause and the cause-in-fact of their damages that stem from being unaware that the genetic material used for the IVF process did not belong to Husband. Husband had multiple opportunities to realize that the genetic material used to create the embryo transferred to Surrogate could not have been Husband's, both because it predated the lone sample Husband claims he provided in March of 2010, and because it was delivered by Wife rather than collected from Husband at a medical facility. Surrogate's claimed damages are tied in Appellants' petition and in their argument on appeal to Husband's knowledge regarding the sperm samples at issue, thus Surrogate's claimed damages are also negated by the undisputed facts that Husband had reason to know in 2010 that the sperm Dr. Silber used was not Husband's.

In addition to their claim for actual damages, Husband and Surrogate assert that the actions by Dr. Silber and St. Luke's warrant the award of punitive damages. Missouri follows the general rule that no punitive damages can be awarded absent an award of actual

9

or nominal damages. <u>Lindahl v. State</u>, 359 S.W.3d 489, 493 (Mo. App. W.D. 2011). We thus reject the argument that punitive damages should be awarded because Husband and Surrogate cannot prove actual or nominal damages from the failure to be informed of Husband's test results.

Because an element of Appellants' *prima facie* case is that Respondents' failure to inform Husband of his test result caused them damages, and Respondents established uncontroverted material facts affirmatively negating the damages element of Appellants' claim, Respondents are entitled to judgment as a matter of law. <u>Lisle</u>, 667 S.W.3d at 107. Accordingly, the trial court did not err in granting Respondents' motion for summary judgment. <u>Id.</u>

Conclusion

For the reasons set forth above, we affirm the trial court's grant of summary judgment in favor of Respondents.

_____

Gary M. Gaertner, Jr., J.

Lisa P. Page, P.J., and
Angela T. Quigless, J., concur.