

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **MICHAEL L. MACKEY, et al.,** | ) | |
| | ) | |
| **Respondents-Appellants,** | ) | **WD76214** |
| | ) | **(Consolidated with WD76215** |
| **v.** | ) | **and WD76252)** |
| | ) | |
| | ) | **OPINION FILED:** |
| **STEVEN B. SMITH, M.D., et al.,** | ) | **August 12, 2014** |
| | ) | |
| **Appellants-Respondents.** | ) | |

### Appeal from the Circuit Court of Nodaway County, Missouri
### The Honorable Roger M. Prokes, Judge

**Before Division I:** Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick and Karen King Mitchell, Judges

Dr. Thomas V. DiStefano and his employer, SSM Regional Health Services (collectively, "DiStefano"), and Dr. Steven B. Smith and his employer, Northland Bone & Joint, Inc. (collectively, "Smith"), each appeal the judgment of the Circuit Court of Nodaway County, Missouri ("trial court"), awarding Michael L. Mackey and his wife, Billie R. Mackey (collectively, "the Mackeys"), damages against both DiStefano and Smith for medical malpractice in the course of their treatment of Mr. Mackey. Both DiStefano and Smith allege several points of trial error. The Mackeys cross-appeal, claiming that the trial court erred in refusing to award post-judgment interest on the Mackeys' damage award. We affirm.

## Factual and Procedural Background[1]

On September 17, 2007, DiStefano performed a total hip replacement on Mr. Mackey at St. Francis Hospital in Maryville, Missouri. DiStefano placed a prosthetic hip stem into the canal of Mr. Mackey's femur. During the operation, a fluoroscopy-type x-ray was performed, reflecting that the prosthetic stem was placed at a varus (outward) angle in the canal of the femur, but the extent of the varus could not be determined by the film. DiStefano was not concerned with what he considered a "slight" varus and completed Mr. Mackey's operation. DiStefano did not take any post-operative x-rays after the surgery although he had been trained to do so. DiStefano allowed Mr. Mackey to bear weight on his legs, as tolerated, immediately after the surgery.

On October 1, 2007, Mr. Mackey was evaluated at DiStefano's office and Mr. Mackey reported at that time that he was doing well with his walker, but that he experienced pain when he attempted to walk with a cane. Mr. Mackey was advised to continue to use his cane as much as possible.

Later that evening, Mr. Mackey was home alone and went outside onto his back porch, using his cane. At some point he felt his right leg give way, which made him fall backward and to the left. Mr. Mackey did not remember hitting the ground, but he pulled himself to a chair and waited for Mrs. Mackey to return home. Mr. Mackey told his wife that he thought his hip had come out of the socket; he did not know that his leg had been broken. Mr. Mackey went to the hospital in an ambulance after his wife and a family friend were unable to move him themselves. At the hospital, x-rays confirmed that Mr. Mackey had suffered a severely comminuted fracture of his femur. DiStefano reviewed the x-rays the next morning and told Mr. Mackey that he most

---

[1] "The pertinent facts are viewed in the light most favorable to the jury's verdict." *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 196 n.3 (Mo. App. W.D. 2013).

likely had had a crack in his femur and that the prosthesis, when Mr. Mackey put his weight on it, acted like a wedge and cracked through the bone.

Mackey's revision surgery was performed at North Kansas City Hospital by Dr. Smith. Smith performed the hip revision surgery on October 3, 2007. The surgery appeared to have been successful, even though Mr. Mackey's fractures were the worst involving a prosthetic hip that Smith had ever treated. Dr. Smith noted the rotational pattern of Mackey's fractures and believed that the top part of Mackey's femur "blew apart" because the prosthetic stem was pushed into the femur canal. Smith did not believe that the fracture was caused by Mackey's hitting the floor when he fell.

On October 8, 2007, Mackey's chart described his surgical wound as warm with a moderate amount of purulent draining and a foul odor. Mackey was prescribed oral doxycycline, which is an antibiotic given to prevent infection; he was released from the hospital that day. On October 11, 2007, Mr. Mackey reported to Northland Bone & Joint several days before his scheduled appointment because he was concerned about continuing drainage of his wound. Mackey was seen by one of Dr. Smith's partners, who ordered a culture of the wound drainage. The culture indicated heavy growth of the bacteria methicillin resistant staphylococcus aureus (MRSA). The lab sent the culture result to Northland Bone & Joint, and it made its way to Mackey's file, but Smith does not remember when he first saw the culture result, and Mackey was not told that he had MRSA. Smith continued to evaluate Mackey's progress through the fall of 2007, and on December 14, Smith discontinued Mackey's prescribed doxycycline, noting that his wound had healed.

In early January of 2008, Mackey experienced a buildup of fluid around his former wound site, which burst open and began draining fluid again. Mackey went back to see

3

Dr. Smith on January 11, 2008, at which time Smith expressed a strong suspicion of a deep-wound infection. Mackey was again placed on doxycycline, even though Dr. Smith knew that doxycycline would not cure a deep-wound infection involving hardware; a deep-wound infection would require an intravenous antibiotic such as vancomycin. On January 31, Smith conducted a right hip aspiration on Mackey that was positive for MRSA deep within the wound. Dr. Smith notified Mackey that he had an MRSA infection on February 8, 2008. Mackey was left on the doxycycline, and prosthetic removal surgery was scheduled for February 27, 2008.

As of February 28, 2008, Mackey's antibiotic care was managed by infectious disease specialist Dr. Henry, who administered intravenous vancomycin. Mackey treated with Dr. Henry through April of 2008.

In the summer of 2008, Mackey transferred his care to the University of Kansas Medical Center ("KU Med"). The physicians at KU Med concluded that Mackey was not a good candidate for further revision to his hip due to the infection and resultant loss of blood flow and viable bone. Thus, Mackey underwent amputation of his right leg at the hip on August 12, 2008.

The Mackeys asserted medical malpractice and loss of consortium claims against DiStefano in the Circuit Court of Nodaway County on September 9, 2008. They later brought a separate medical malpractice and loss of consortium suit against Smith in Clay County, Missouri, on April 15, 2010. On May 14, 2010, the Mackeys dismissed the Nodaway County action without prejudice. On May 21, 2010, the Mackeys filed a first amended petition in their Clay County action, adding DiStefano and reinstating their claims against him. DiStefano responded that the claims against him in the Mackeys' first amended petition in the Clay County suit were barred by the applicable two-year statute of limitations for medical malpractice actions. The Mackeys countered that Missouri's savings statute served to preserve their right to bring the

4

claim, because the allegations against DiStefano were the same as in the Nodaway County suit and because the reinstatement of their claims against DiStefano via the first amended Clay County petition occurred within one year of their voluntary nonsuit in the Nodaway County action. The trial court agreed and refused to dismiss the claims against DiStefano, but the trial court transferred the case back to Nodaway County. A jury trial followed.

The jury found in favor of the Mackeys against both DiStefano and Smith, itemizing past and future economic and non-economic damages against DiStefano in the amount of $1,773,500 and against Smith in the amount of $1,684,000; judgment was entered in accordance with the jury's verdicts. Each of the parties filed appeals relating to the trial court's judgment, and the appeals were consolidated by this court for review. Further relevant facts will be set forth below as necessary to our analysis.

## Analysis

### Statute of Limitations

DiStefano's first point on appeal is that the trial court erred in refusing to dismiss the claims against him and his employer in that the Mackeys' claims against him are barred by Missouri's two-year statute of limitations for medical malpractice actions as set forth in section 516.105.[2] DiStefano claims that the trial court erroneously concluded that the savings statute applied. The application of a statute of limitations is a question of law that this court reviews *de novo. Molder v. Trammell Crow Servs., Inc.*, 309 S.W.3d 837, 840 (Mo. App. W.D. 2010).

---

[2] All statutory references are to RSMo 2000, as updated. Section 516.105 provides, in relevant part:

All actions against physicians, hospitals . . . and any other entity providing health care services and all employees of any of the foregoing acting in the course and scope of their employment, for damages for malpractice, negligence, error or mistake related to health care shall be brought within two years from the date of occurrence of the act of neglect complained of . . . .

The savings statute, section 516.230, provides:

If any action shall have been commenced within the times respectively prescribed in sections 516.010 to 516.370, and the plaintiff therein suffer[s] a nonsuit, . . . such plaintiff may commence a new action from time to time, within one year after such nonsuit suffered . . . .

"[A] litigant must meet three requirements in order for the savings statute to apply: (1) the original action must have been timely filed; (2) the second cause of action is the same as the first; and (3) the plaintiff suffered a nonsuit in the first cause of action." *Molder*, 309 S.W.3d at 841.

Here, DiStefano does not dispute that the original Nodaway County action against DiStefano was timely filed, the amended petition filed in the Clay County action made the same allegations (as to DiStefano) as the first action, and the first cause of action was nonsuited. DiStefano's complaint is that the savings statute is inapplicable because the Mackeys' new action did not occur *after* the first action was nonsuited.

DiStefano claims that the Mackeys' reinstatement of their claims against him by amending their petition in the Clay County action did not constitute a "new action" as contemplated by the savings statute. Instead, DiStefano contends, the Clay County action was "commenced" when the Mackeys' initial petition against Smith was filed in Clay County, *before* the nonsuit in the Nodaway County action.

DiStefano cites Rule 53.01, which does indeed state that "[a] civil action is commenced by filing a petition with the court." However, from there, DiStefano ignores Missouri law, citing various state and federal cases from outside Missouri, including an *unpublished* case from the Michigan Court of Appeals, which he claims "clearly" mandates a ruling in his favor. "Unpublished decisions of the courts of other states are not persuasive authority in this court." *J.B.M. v. S.L.M.*, 54 S.W.3d 711, 714 (Mo. App. S.D. 2001). What *is* persuasive in this court is precedent from our Missouri Supreme Court concluding that, for statute of limitations purposes,

the "commencement" of an action as to a particular party occurs when that party is first added to the lawsuit:

> It is the general rule, where defendants are brought into an action for the first time upon the filing of an amended or supplemental pleading, that the filing of the amended pleading constitutes the commencement of the action in so far as the new defendant is concerned . . . .

*Byrnes v. Scaggs*, 247 S.W.2d 826, 830 (Mo. 1952) (internal quotations omitted).

Applied to this case, then, the Mackeys "commenced" their new action against DiStefano by way of filing their amended petition in the Clay County action on May 21, 2010, seven days *after* the Mackeys voluntarily dismissed their Nodaway County action against DiStefano. Accordingly, the Mackeys' Clay County suit falls squarely within the savings statute, and the trial court did not err in refusing to dismiss the claims against DiStefano and his employer.

DiStefano's first point is denied.

**"Rule of Nine" or "One Juror" Rule**

In DiStefano's second point on appeal[3] and Smith's first point on appeal, both DiStefano and Smith argue that the jury's verdicts cannot support the trial court's judgment because the same nine jurors did not agree to each of verdicts A-2, B-2, and C-2. At trial, the trial court gave Instruction No. 5, which was patterned on MAI 2.04. That instruction stated:

> There are two claims submitted to you and each of them contains a separate verdict form, which are A and B. A third verdict form C is included which may be filled out depending on your findings under Verdicts A and B. The verdict forms included in these instructions contain directions for completion and will allow you to return the permissible verdicts in this case. Nine or more of you must agree in order to return all verdicts. A verdict must be signed by each juror who agrees to it.

---

[3] DiStefano's second point identifies five separate and distinct challenges to the verdict forms that were eventually accepted by the trial court and is, therefore, multifarious. "Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal." *State v. Brightman*, 388 S.W.3d 192, 196 (Mo. App. W.D. 2012) (internal quotation omitted). However, as the essence of DiStefano's second point on appeal is also the subject of one of Smith's properly preserved challenges to the judgment, we will review DiStefano's point *ex gratia* to the extent that it coincides with Smith's challenge in Smith's first point on appeal.

Verdict A allowed the jury to find in favor of either the Mackeys or DiStefano on the Mackeys' claims against DiStefano. Verdict B allowed the jury to find in favor of either the Mackeys or Smith on the Mackeys' claims against Smith.[4] Verdict C was to be used to assess damages and to apportion them between DiStefano and Smith in the event that the jury found both doctors negligent.

At the end of the jury's deliberation, it returned verdicts A, B, and C. Nine jurors signed Verdict A, finding DiStefano negligent. Ten jurors signed Verdict B, finding Smith negligent, but only eight of the ten had also found DiStefano negligent on Verdict A. All eleven jurors who had signed *either* Verdict A or Verdict B (or both) signed Verdict C, assessing damages and apportioning them to DiStefano and Smith. Initially concluding that these verdict forms were inconsistent, the trial court submitted to the jury Instruction No. 19, which stated, "The court cannot accept your verdicts as written because the verdict forms A, B, and C are inconsistent and erroneous in that they do not comply with Instruction No. 5. New verdict forms are attached for your use, if needed. Do not destroy any of the verdict forms."

After receiving Instruction No. 5, the jury returned the new verdict forms, which had been labeled A-1, B-1, and C-1, but were otherwise identical to Verdicts A, B, and C. A-1 and B-1 were unsigned by any of the jurors, and C-1 was signed by all eleven jurors who had initially signed Verdict C. In response, the court submitted Instruction No. 20, which stated:

> The court cannot accept your verdicts as written because the verdict forms A-1
> and B-1 are incomplete and unsigned, and are inconsistent and erroneous in that
> they do not comply with Instruction No. 5 because nine or more of you must

---

[4] At oral argument, it was disclosed that the Mackeys' attorney originally packaged the jury instructions to be submitted to the trial court as only including Verdicts A and B, with each verdict assessing both liability and damages. Frankly, this is the preferable manner in which to submit the case to the jury. However, attorneys for Smith and DiStefano were concerned that the jury might duplicate damages against the defendant doctors, and eventually, all of the parties stipulated to submit a separate verdict form for damages, Verdict C.

agree in order to return all verdicts.  New verdict forms are attached for your use, if needed.  Do not destroy any of the verdict forms.

The jury returned the new verdicts (A-2, B-2, and C-2) to the court.  The same nine jurors who had originally signed Verdict A had signed Verdict A-2.  The same ten jurors who had originally signed Verdict B had signed Verdict B-2.  And the same eleven jurors who had originally signed Verdict C, and each of whom had signed either Verdict A-2, or Verdict B-2, or both, signed Verdict C-2.  At this point, the trial court released the jury.  The trial court had intended to call the jury back for further deliberations, but in the intervening time, and upon the Mackeys' motion, the trial court reconsidered its previous rulings,[5] accepted Verdicts A-2, B-2, and C-2, and entered judgment thereon.  DiStefano and Smith both argue that the trial court erred in doing so.

Both DiStefano and Smith complain that the jury's verdicts violate a principle known as either the "same juror" rule or the "rule of nine."   Article I, section 22(a) of Missouri's Constitution and section 494.490 provide, "Three-fourths or more jurors may return a lawful verdict" in civil cases.[6]  *See State ex rel. Boyer v. Perigo*, 979 S.W.2d 953, 956 (Mo. App. S.D. 1998).  This means that in any civil case, to find in favor of a plaintiff, at least nine of twelve jurors must agree on each element of a particular claim against a particular defendant, including the amount of the plaintiff's damages.  *Id.*  The defendants in this case argue on appeal that,

_____

[5] Even though the trial court initially indicated that it believed that Verdicts A-2, B-2, and C-2 were inconsistent and could not support a verdict and that it would have to require the jury to return and deliberate further, any ruling by the trial court prior to final judgment is considered interlocutory and is subject to change.  *See, e.g., State v. Loyd*, 326 S.W.3d 908, 911 (Mo. App. W.D. 2010); *State v. McCullum*, 63 S.W.3d 242, 259 (Mo. App. S.D. 2001).  Here, as we explain in our ruling today, the trial court validly changed its ruling at trial in accordance with Missouri law.

[6] At oral argument, the attorneys for Smith and DiStefano conceded that they both argued for the use of Verdict C while also conceding that they believed that the only way for Verdict C to comply with the "rule of nine" would be for identical jurors to sign ALL three verdict forms—this, even though they were also cognizant of Missouri precedent expressly authorizing a *different* nine jurors to permissibly find separate defendants liable to plaintiffs.  Hence, as we explain in our ruling, if ever there was a case of invited error, this is surely an obvious example.

because there were not nine jurors in common who found *both* DiStefano and Smith to have been negligently responsible for Mr. Mackey's injuries, yet participated in assessing and apportioning damages, that the above-stated principle of law and article I, section 22(a) were violated. We disagree.

Missouri case precedent states that where there are multiple counts and multiple defendants, a different group of nine jurors can agree to all of the elements of each respective count. *See Kemp v. Burlington N. R.R. Co.*, 930 S.W.2d 10, 12 (Mo. App. E.D. 1996). *Kemp* stated, "As to each count nine jurors were required to agree on liability and damages. That could have been two different groups of nine on each count, but for each count the same nine had to agree on liability and damages." *Id.* As long as nine jurors agree to liability and the amount of damages, a different nine jurors may apportion the damages between two defendants. *Powell v. Norman Lines, Inc.*, 674 S.W.2d 191, 199 (Mo. App. E.D. 1984). In *Powell*, the jurors who signed the verdict form apportioning damages (in that case assessing relative fault for a single injury) were not the same jurors who had signed the verdict form finding both defendants liable and assessing damages. *Id*. at 194. The *Powell* court stated that "a juror who has disagreed with the majority on the issue of negligence may still vote on the issue of how to apportion damages among the parties." *Id.* at 199. "To hold otherwise would be to prohibit jurors who dissent on the question of a party's liability from participation in the important remaining issue of allocating responsibility among the parties, a result that would deny all parties the right to a jury of 12 persons deliberating on all issues." *Id.* (internal quotation omitted). To be sure, a defendant would want a juror who did not believe that he was negligent in the first instance to be able to argue that he at least should shoulder less of the burden of the plaintiff's damages.

10

In any event, this issue is a red herring in the case at bar, because as to each defendant in this case, every juror who found that particular defendant liable also found both the amount of damages and the portion of those damages that was attributable to the negligence of that defendant. The defendants can, at best, complain that *extra* jurors, other than the nine required, participated in assessing the damages that the plaintiff suffered and in determining for how much of those damages each defendant was responsible.

Such might not have been the case if some of the jurors who had signed either Verdict A or B had refused to sign Verdict C. In that case, there might not have been nine jurors determining the amount of damages for which one or the other defendant was liable, which would have been impermissible per *Boyer*, 979 S.W.2d at 957. This was a risk that the trial court and the parties ran by assessing and apportioning damages on verdict forms that were separate from those that found liability. However, the parties stipulated to the use of these verdict forms. If a party disagrees with a verdict form, "specific objections must be made at the time the verdict forms are given to the jury." *Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 924 (Mo. banc 1992).[7] Here, not only did the defendant appellants fail to object to the C-type verdict director, they argued for its use—this knowing that the law did *not* require the same nine jurors to find that both Smith and DiStefano were negligent. *See Kemp*, 930 S.W.2d at 12. Smith's counsel even stated, "Just for the record, I believe it is the best we can do on behalf of Dr. Smith." The defendants' argument that the C-type verdict form be submitted means that its submission, if error at all, amounts to invited error. *See State v. Massa*, 410 S.W.3d 645, 658 (Mo. App. S.D. 2013). Allowing the defendants to insist on submission of a C-type verdict director and also requiring an identical nine or more jurors to sign all three verdict directors would amount to a

_____

[7] DiStefano's counsel did object to the language regarding causation on the "A" verdicts, not wanting to use the causation language in MAI 19.01, but did not object to the jury assessing damages on a separate "C" verdict.

11

reversal of *Kemp* and would constitute a significant departure from established Missouri precedent. While this may amount to clever lawyering at trial on behalf of DiStefano and Smith, it is not a basis for reversal on appeal.

DiStefano's second point and Smith's first point are denied.

*MAI 19.01 and Successive Tortfeasors*

DiStefano's third point on appeal is that the trial court erred in giving an MAI 19.01 modified instruction to the jury in Instruction No. 8. We review claims of instructional error *de novo*. *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 159 (Mo. banc 2012). We will not vacate a judgment on the basis of such an error, however, unless that error materially affected the merits of the action. *Id.* Therefore, "[t]he party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to the party challenging the instruction." *Id.* In this case, Instruction No. 8 stated:

> In your verdict A, on plaintiff Michael Mackey's claim against defendants Thomas V. DiStefano, M.D./SSM Regional Health Services, your verdict must be for the plaintiff Michael Mackey if you believe . . . such negligence either directly caused damage to plaintiff Michael Mackey or combined with the actions of subsequent medical providers to directly cause damage to plaintiff Michael Mackey.

In Missouri, an initial tortfeasor is generally liable to the plaintiff for both the harm he originally inflicted as well as any aggravation of the injury that is caused by the reasonably foreseeable negligence of another. *See, e.g., State ex rel. Tarrasch v. Crow*, 622 S.W.2d 928 (Mo. banc 1981). This includes subsequent medical malpractice, and the "original tortfeasor doctrine" has been applied in medical malpractice cases involving subsequent acts of medical malpractice. *Montgomery v. S. Cnty. Radiologists, Inc.*, 168 S.W.3d 685, 690 (Mo. App. E.D. 2005).

In 2005, the Missouri legislature amended section 538.210 in several respects, including amending section 538.210.2(3), so that it states:

No individual or entity whose liability is limited by the provisions of this chapter shall be *liable* to any plaintiff based on the actions or omissions of any other entity or person who is not an employee of such individual or entity whose liability is limited by the provisions of this chapter.

(Emphasis added.) DiStefano claims that the amendment of this subsection serves as a legislative abolishment of the original tortfeasor doctrine as it applies to medical malpractice lawsuits. While he cites to no Missouri case so holding, we find that it is unnecessary to address this contention in order to rule that the trial court did not err in submitting Instruction No. 8 based upon MAI 19.01.

Instruction No. 8 does not instruct the jury that DiStefano is *liable* for any malpractice it might find on Smith's part. MAI 19.01 does not impute one party's negligence to another party. It simply is to be used in cases where the causation language of other instructions might be misleading to the jury. MAI 19.01 provides as follows:

In a case involving two or more causes of damage, the "direct result" language of paragraph Third of verdict directing instructions such as 17.01 or 17.02 might be misleading. In such cases, at plaintiff's option, one of the following may be substituted:

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Third, such negligence either directly caused damage to plaintiff or combined with the [acts of (*here describe another causing damage)*] [condition of the (*here describe product*)] to directly cause damage to plaintiff.

(Footnotes omitted.) DiStefano argues that this instruction is appropriate only for *joint* tortfeasors, not for *successive* tortfeasors such as himself and Smith. But this court has approved the use of MAI 19.01 for successive tortfeasor situations. *See Mathes v. Sher Express, LLC*, 200

13

S.W.3d 97, 108 (Mo. App. W.D. 2006) ("'Multiple Causes' includes successive, not merely joint, tortfeasors. There was no error in the use of the 19.01 modification.").[8]

Of note, in this case, the jury was required by its verdict to itemize economic and non-economic damages from "9/17/07 through 12/14/07" and from "12/15/07 to present" as well as future medical damages and future economic damages excluding future medical damages; and most notably, the jury was expressly required to itemize those damages specifically attributable to Smith in one column and to DiStefano in a separate column. By its verdict, it is clear that the jury did exactly that—expressly itemizing damages attributable to each separate defendant. Accordingly, it is not apparent that Instruction No. 8 submitted to the jury in this case erroneously caused the jury to find that DiStefano was *liable* for Smith's negligence, but merely for the part of the damages that was attributable to DiStefano's negligence.

Finally, to the extent that DiStefano takes issue with Instruction No. 8, he could and should have submitted his own substitute instruction to the trial court. *See Kansas City Power & Light Co. v. Bibb & Assocs., Inc.*, 197 S.W.3d 147, 157 (Mo. App. W.D. 2006). There is no evidence that DiStefano submitted an alternate instruction with his suggested language as to causation, and he does not argue that he did so in his appellate brief. And DiStefano agreed at trial that the verdict directors were appropriate other than the causation language, which received his general objection but no suggested alternatives, in order to ensure that the Mackeys did not receive multiple recoveries of damages. In fact, the strategy was clearly successful, as the jury did *not* award multiple recoveries but, instead, determined damages and meticulously

---

[8] Not only does Instruction No. 8, a modification of MAI 19.01, not render the physician, in this case DiStefano, liable for the malpractice of his co-defendant, in this case Smith, but the other cause of damage warranting the use of MAI 19.01 need not even involve another party to the case. *Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 594 (Mo. App. W.D. 2008). Such is the case when one of the causes that "combines" with the acts of the physician alleged to have committed malpractice is a pre-existing medical condition. *Id.* Obviously, in those cases, the defendant physician would not be liable for the pre-existing condition; instead, he would be liable for the harm he caused in aggravating it. Yet, the "combines with" language of MAI 19.01 is appropriate in order not to confuse the jury with the "direct result" language of other MAI instructions.

14

apportioned them between DiStefano and Smith. Accordingly, DiStefano has shown neither that the trial court submitted Instruction No. 8 in error nor that he was in any way prejudiced thereby.

DiStefano's third point is denied.

***Proof that DiStefano caused Mackey's Injuries***

DiStefano's fourth point on appeal is that the trial court erred in denying his motions for directed verdict and JNOV because there is not substantial evidence that DiStefano's negligence caused Mr. Mackey's injuries. We review the trial court's denial of a motion for directed verdict or JNOV *de novo* to determine whether the plaintiff has made a submissible case. *U.S. Neurosurgical, Inc. v. Midwest Div.-RMC, LLC*, 303 S.W.3d 660, 664 (Mo. App. W.D. 2010).

To make a submissible case of medical malpractice, the plaintiff must show: "(1) an act or omission of the defendant failed to meet the requisite standard of care; (2) the act or omission was performed negligently; and (3) the act or omission caused the plaintiff's injury." *Mueller v. Bauer*, 54 S.W.3d 652, 656 (Mo. App. E.D. 2001). "A defendant's conduct is a cause of the event if the event would not have occurred 'but for' that conduct." *Id.* (citing *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860-61 (Mo. banc 1993)). However, the Supreme Court, in *Callahan*, noted that the concept of "but for" causation was "less important in Missouri than in most jurisdictions" because under MAI we do not use the term "but for causation"; instead, "[w]e merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to cause' plaintiff's injury." *Callahan*, 863 S.W.2d at 863.

DiStefano claims on appeal that the Mackeys presented no evidence of "but for" causation because Mr. Mackey re-fractured his femur when he tripped on a rug and fell, and the Mackeys' evidence did not establish that DiStefano's negligence caused Mr. Mackey to trip on the carpet or that the fall would have resulted in a periprosthetic femur fracture absent

15

DiStefano's negligence. DiStefano's argument overlooks the fact that there was a factual issue as to whether Mackey's fall caused the fracture or whether the fracture caused his fall.

Although evidence was presented to support DiStefano's theory that Mackey tripped on a rug in his home and fell, fracturing the femur, there was also evidence to the contrary. Mackey told DiStefano the morning after his fall that he had "felt his leg give out before he fell." From DiStefano's discussion with Mackey and his own review of the post-fall x-rays, DiStefano initially concluded that Mackey:

> probably had a crack when the prosthesis was put in, although it was not noted on the intraoperative x-ray, nor was there any sort of giving in surgery that would have indicated that. But the pattern of the fracture and lack of significant trauma, he most likely had a crack and he put his weight on it; the prosthesis acted as a wedge and cracked through.

Also, Smith testified that upon reviewing Mr. Mackey's records prior to the revision surgery, he believed that the stem of the prosthesis was too small and that the size of the prosthesis, and not the fall itself, contributed to cause the fracture. He stated,

> It is my opinion that the proximal femur, the top part, did blow apart into two or more pieces because the stem was pushed down the canal. Whether that happened because the stem was too small or all the support below it fracture[d] and then the stem went down, I'm not certain. But certainly the stem being pushed down the canal did blow the top part of the femur apart.

The Mackeys' expert, Dr. Richard Vanis, testified that DiStefano placed the stem of the prosthesis at a "significant varus" angle (an outward angle of not less than fifteen degrees). He opined that the varus turned the prosthetic stem into a lever. He noted that Mackey's physical therapy notes indicated that he was inhibited and had decreased ambulation on the day that he later fell, and Dr. Vanis opined that the prosthetic stem had probably loosened. Then, that evening, when Mr. Mackey put his weight on the prosthesis, "[a]s it rotated the prosthesis became loose and his weight probably forced it [the prosthetic stem] down the canal, which

16

forced it [the femur] to split." Dr. Vanis testified that this would not have happened if the stem had been placed "directly down the femur" instead of at the varus angle. Dr. Vanis also testified that if DiStefano had taken a post-operative x-ray, he could have directed Mackey to avoid putting weight on the prosthesis until the bone around the prosthesis filled in. Dr. Vanis concluded that DiStefano breached the standard of care which led to or caused the injury that Mackey sustained on October 1, 2003 (his fall and the fractured femur).

In sum, there is substantial evidence for the jury to conclude that the periprosthetic fracture occurred prior to Mr. Mackey's fall and was due to DiStefano's negligence instead of a separate and intervening incident that was not the result of DiStefano's negligence.

DiStefano's fourth point is denied.

### Post-December 15, 2007 Damages

DiStefano's fifth point on appeal is that the trial court erred in denying his motions for directed verdict and JNOV because the Mackeys failed to prove that "any" damages after December 15, 2007, were attributable to the negligence of DiStefano and not exclusively to Smith. DiStefano cites *State ex rel. Nixon v. Dally*, 248 S.W.3d 615 (Mo. banc 2008), in support of his appellate brief's claim that "successive tortfeasors, alleged to have caused separate, divisible[,] and distinct damages[] cannot be jointly responsible for the same damages, let alone equally responsible for 50% of the same damages." We disagree with DiStefano's interpretation of *Nixon*. *Nixon* simply holds that two successive tortfeasors may be joined into a single action under the permissive joinder rule. *Id.* at 617. *Nixon* involved a plaintiff who had been rear-ended by two different defendants in separate accidents occurring months apart. While the *Nixon* court said that "each defendant would be liable only for the damages that the particular defendant caused," it did not rule out entirely the possibility that some of the plaintiff's injuries

17

might be attributable to both accidents. *Id.* at 618 n.4. It certainly did not state that the first tortfeasor's liability would be cut off from the moment of the occurrence of the second tortious act. In fact, *Nixon* mentioned that situations might occur where the injuries would be "indivisible, or to have been aggravated in another accident." *Id.* at 618. Such is the case here. Moreover, unlike in *Nixon*, it is DiStefano's negligence that caused the very need for Smith to become involved in the first instance.

Also, because of the procedural posture in *Nixon*, no evidence had been presented yet; Nixon, the plaintiff, was simply seeking a writ prohibiting the trial court from severing her action against the two separate defendants. *Id.* at 616. In this case, there was evidence presented by the Mackeys that would support the jury's findings that some of their post-December 15 damages were attributable to DiStefano. Dr. Smith testified that the hip revision surgery, which was an effort to fix the worst periprosthetic fracture that Smith had ever treated and constituted a further disruption of Mr. Mackey's soft tissue, affected Mr. Mackey's blood flow in a negative fashion. This increased Mackey's risk for infection during the revision surgery. Smith also testified that as of January 11, 2008, he chose to take the more conservative approach of prescribing oral doxycycline, instead of a more aggressive strategy of aspirating the wound to check for deep infection and then removing the prosthesis, because he wanted to let the periprosthetic fracture heal first. Therefore, the fracture, which the jury determined to have been caused by DiStefano's negligence, factored into Smith's treatment decisions after December 15, 2007.

Similarly, the surgeon who eventually amputated Mr. Mackey's leg testified that the decreased blood flow, tissue damage, and scar tissue from the multiple surgeries, which may all be at least partially attributable to Dr. DiStefano, factored into the ultimate inability to save the leg.

Thus, substantial evidence exists to support the jury's finding that some of the Mackeys' post-December 2007 damages were attributable to DiStefano's negligence.

Finally, as noted above, DiStefano did not object to the form of verdict directors C, C-1, and C-2, or to the fact that all three had spaces allowing for the jury to apportion damages after December of 2007 to DiStefano. As such, he has not preserved his right to object to this aspect of the jury's verdict or the ensuing judgment. *See* Rule 70.03 ("Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); *Gorman v. Wal-Mart Stores, Inc.*, 19 S.W.3d 725, 729 (Mo. App. W.D. 2000) (applying Rule 70.03).

DiStefano's fifth point is denied.

***Excessiveness of Jury Award***

DiStefano's sixth and final point on appeal, which is also Smith's third point on appeal, is that the trial court erred in denying motions for new trial or for remittitur because the amounts of the jury's verdicts against them were not supported by the Mackeys' evidence at trial. The Mackeys counter that section 538.300 provides that remittitur does not apply in medical malpractice cases, and both DiStefano and Smith acknowledge as much. However, in *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633, 640 (Mo. banc 2012), the Supreme Court held that remittitur is still available in malpractice cases since it declared the statutory cap on damages is unconstitutional. That remittitur may be available in appropriate medical malpractice cases does not end the inquiry.

We review the trial court's denial of motions for new trial and remittitur for abuse of discretion. *Burrows v. Union Pac. R.R. Co.*, 218 S.W.3d 527, 533 (Mo. App. E.D. 2007). "The

standard of review of a claim that the trial court erred in failing to find the verdict excessive is a narrow one: an appellant must show both that the verdict is excessive and that some event occurred at trial that incited the bias and prejudice of the jury." *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 821-22 (Mo. banc 2000). "The mere size of the verdict does not in and of itself establish that it was the result of bias or passion and prejudice without showing some other error was committed during the trial." *Id.* at 822. Neither DiStefano nor Smith alleges any trial error that would have resulted in juror bias or prejudice. Moreover, to warrant remittitur or new trial due to excess, the size of the verdict must be "so grossly excessive as to shock the conscience because it is glaringly unwarranted. In reviewing verdicts to determine if they are excessive, appellate courts overturn only those verdicts that are obviously out of line and grossly improper." *Id.*

In this case, the trial court correctly concluded that the jury's verdict was not "obviously out of line and grossly improper." Mr. Mackey underwent several surgeries, suffered the pain of a broken femur and the accompanying loss of mobility, had an oozing deep-wound infection that went undiagnosed and undertreated for months, and ultimately lost his entire leg at the hip. The damages awarded by the jury (a total of $3,457,000), while substantial, were within the range of what the Mackeys' experts quantified. For example, Dr. Ward, who testified as to Mr. Mackey's future life care costs, estimated the amount to have been a present value of $1,541,474 based upon Mr. Mackey's life expectancy.[9] The jury ultimately awarded $1,000,000 in future medical damages. The bulk of the remaining damages awarded by the jury were non-economic damages

---

[9] Though the appellants complain that Dr. Ward's estimates are based upon a life expectancy of 81 years, which the Mackeys concede does not apply to someone with Mr. Mackey's medical conditions, the jury also heard testimony from another of the Mackeys' experts, Dr. Simon, that Mr. Mackey's life expectancy would be 73 or 74 years. That the jury's award is approximately one-third less than Dr. Ward's estimate indicates that it considered the testimony regarding Mr. Mackey's reduced life expectancy.

20

totaling $1,870,000, which given the turmoil suffered by the Mackeys, can hardly be described as "so grossly excessive as to shock the conscience."

DiStefano and Smith also both argue that the award is excessive in that the Mackeys did not sufficiently establish that Mr. Mackey would need prosthetics, that he would need future shoulder surgery, or that he would suffer future MRSA infections. But the Mackeys' experts did testify that Mr. Mackey's reasonably certain future medical expenses would include these costs. Neither DiStefano nor Smith objected to this testimony as being unsupported by sufficient factual foundation, and once the evidence was admitted, it became available for the jury to rely upon in rendering its award. *Sanders v. Ahmed*, 364 S.W.3d 195, 209 (Mo. banc 2012). The essence of appellants' arguments on their respective points is their view that the Mackeys' experts' testimony was not credible or was incorrect. But this court's province is not to recalculate jury awards according to our own review of the evidence. We "generally defer to the jury's decision as to the amount of damages. This is as it should be because the determination of the amount of damages is a task that lay juries are particularly able to perform." *Giddens*, 29 S.W.3d at 822. We find no basis to disrupt the jury's awards in the present case.

DiStefano's sixth point and Smith's third point are denied.

### Proof of Causation as to Smith

Smith's remaining point on appeal is that the trial court erred in denying his motions for directed verdict and JNOV because the Mackeys failed to establish that Smith's negligence was the cause of the Mackeys' damages. In short, Smith claims that the Mackeys produced no evidence that but for Smith's negligence, Mr. Mackey's infection could have been successfully treated. The record simply refutes this contention.

Dr. Rumans, one of the Mackeys' experts, testified that Mr. Mackey's symptoms and the positive MRSA culture in October of 2007 should have alerted Smith to the need to consult an infectious disease specialist, who could have confirmed a deep-wound infection at that time by conducting "things like laboratory work, x-rays, aspirating the hip, and so forth." Dr. Rumans testified that if this had been done, the MRSA could have been eradicated. He testified that, even in November or December, although the MRSA could not have been completely eradicated, it could have been controlled while the fractured bone healed, at which time the infection could have been treated more aggressively. Dr. Rumans concluded that had Smith timely consulted with an infectious disease consultant, they could have worked together to treat Mr. Mackey effectively so that he would "not lose his extremity." Dr. Vanis's testimony was consistent with Dr. Rumans's testimony. Plainly and simply, this testimony constitutes substantial evidence of causation supporting the jury's verdict as to Smith.

Smith's second point is denied.

### *Post-Judgment Interest*

The Mackeys raise two claims in their cross-appeal, both concerning the trial court's refusal to award post-judgment interest. DiStefano and Smith requested that the trial court refuse to grant post-judgment interest to the Mackeys based upon section 538.300, which states, "The provisions of section 260.552, sections 537.068 and 537.117, and 537.760 to 537.765, and **subsections 2 and 3 of section 408.040 shall not apply to actions under sections 538.205 to 538.230.**" (Emphasis added.) Subsections 2 and 3 of section 408.040 provide for post-judgment interest and some pre-judgment interest in tort actions. DiStefano and Smith argue that section 538.300 makes post-judgment interest unavailable for medical malpractice cases. The Mackeys counter that medical malpractice actions, which existed at common law, are not "actions under

sections 538.205 to 538.230" and that those sections do not provide for any cause of action. The Mackeys are technically correct in arguing that there are no actions "under sections 538.205 to 538.230." However, unless section 538.300 is meaningless, it must mean actions *limited by* or *governed by* sections 538.205 to 538.230. It is clear that, in enacting section 538.300, the legislature intended to eliminate post-judgment interest and pre-judgment interest in medical malpractice cases.[10]

The Mackeys' first claim of error is denied.

The Mackeys' final argument is that section 538.300 is an infringement on their right to a jury trial as guaranteed in Missouri's constitution.[11] *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633, 641 (Mo. banc 2012), declared that article I, section 22(a) of Missouri's Constitution prohibits the state legislature from enacting any law that infringes upon Missouri citizens' rights to a jury trial as they existed at common law in 1820, when Missouri's Constitution went into effect. Thus, the Supreme Court in *Watts* found that section 538.210 was unconstitutional because it limited the jury's right to assess non-economic damages in medical malpractice actions, which existed at common law in 1820. The Mackeys are correct that *Watts* says, "Missouri citizens retain their individual right to trial by jury subject only to judicial remittitur based on the evidence in the case." *Id.* at 640. *Watts*, however, does not expressly address post-judgment interest for payments due upon judgment. And section 538.300 does not limit the damages that the jury may assess in any case—indeed, the jury does not assess

---

[10] The Mackeys cite *McCormack v. Stewart Enterprises, Inc.*, 956 S.W.2d 310, 313 (Mo. App. W.D. 1997) for the proposition that the general interest statute, section 408.020, applies. We disagree. In *McCormack*, the statute specifically providing for interest in workers' compensation cases was amended such that it only expressly applied to "weekly benefit payments"; thus the court found that the general interest statute still applied to medical expenses about which the Workers' Compensation Act was then otherwise silent. *Id.* Here, the legislature did not alter the statutes pertaining to medical malpractice actions such that they are silent on post-judgment interest. Instead, section 538.300 *expressly* makes post-judgment interest otherwise provided in tort actions inapplicable to medical malpractice actions.

[11] As we discuss in our ruling, this is a statutory interpretation issue, not an issue of the constitutionality of the statute subject to the exclusive jurisdiction of the Missouri Supreme Court.

post-judgment interest at all. Post-judgment interest is, and has always been, a statutory right and not a common law or constitutional right. And it is a statutory right that the *court* imposes upon the jury's verdict if and when the verdict becomes the judgment; therefore, the reasoning behind *Watts* would suggest that because post-judgment interest is created by statute (and not the Constitution or the common law, which the Constitution preserves), it may also be restricted by statute. The present statutory restriction does not impact the Mackeys' constitutional right to a jury trial.

The Mackeys' second point is denied.

## Conclusion

For all of the above-mentioned reasons, we affirm the judgment of the trial court in all respects.

Mark D. Pfeiffer, Presiding Judge

Lisa White Hardwick and Karen King Mitchell, Judges, concur.