

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| KURT D. ELLISON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | WD77728 |
| | ) | |
| O'REILLY AUTOMOTIVE | ) | Opinion filed: March 24, 2015 |
| STORES, INC., | ) | |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI
### THE HONORABLE JAMES W. VAN AMBURG, JUDGE

Before Division Three: Victor C. Howard, Presiding Judge,
James E. Welsh, Judge and Gary D. Witt, Judge

O'Reilly Automotive Stores, Inc. appeals the judgment of the trial court awarding Kurt

Ellison $2,000,000 in punitive damages in his action under the Missouri Human Rights Act for

employment discrimination based on disability. It contends that (1) Mr. Ellison did not make a

submissible case for punitive damages, (2) the punitive damages award was the result of a

constitutionally invalid verdict, and (3) the punitive damages award was excessive. The

judgment is affirmed. The case is remanded to the trial court for an award of reasonable

attorney's fees on appeal.

**Factual and Procedural Background**

Viewed in the light most favorable to the plaintiff and the trial court's decision in accordance with the applicable standard of review for the issues in this appeal, the following evidence was presented at trial. Mr. Ellison was diagnosed in 1994 with myotonic dystrophy, a form of muscular dystrophy (MD). It is a progressive disease that affects his walking, balance, and speech among other things. He has worn leg braces to help with his balance and walking since 2008.

In 1997, Rob Weiskirch, a district manager for O'Reilly Automotive, hired Mr. Ellison as an assistant store manager/manager in training, a position that Mr. Ellison remained in until 2008. During his time as an assistant manager, Mr. Ellison received good performance evaluations, consistently meeting or exceeding requirements. In March 2008, Mr. Weiskirch directed Mr. Ellison's store manager to prohibit Mr. Ellison from answering the commercial customer phone line because customers had difficulty understanding him. Three months later in June 2008, Mr. Ellison expressed an interest in becoming a store manager to Mr. Weiskirch. Mr. Weiskirch told Mr. Ellison that because he was too slow in completing daily tasks, O'Reilly Automotive would not be promoting him to store manager, he was not promotable, and he would not be considered for any management position. Despite this conversation, Mr. Weiskirch promoted Mr. Ellison to interim store manager for store 1216 in Platte County in August 2008 when the store manager resigned. Mr. Ellison became the permanent store manager in November 2008.

In his first performance review as a store manager in March 2009, Mr. Ellison received an overall rating of "meets requirements." In comment sections of the review, Mr. Weiskirch wrote, "Great job on retail sales," "Kurt displays good leadership and holds team accountable,"

2

and "Kurt has made a very positive impact on the store in his first management effort." In his second performance review in March 2010, Mr. Weiskirch gave Mr. Ellison an overall rating of "needs improvement." He rated Mr. Ellison a "meets requirements" on five of the eight review topics—company objective/strategic plan, overall sales ability, leadership/management skills, training, and operational procedures. Mr. Ellison received a "needs improvement" rating on the remaining three topics—customer service, store and team member appearance, and goal achievement. On his 2010 store audit, which is performed once a year and evaluates the overall performance of a store manager in terms of their operational leadership, Mr. Ellison's store received a score of 87. A passing score on a store audit is 80 but a higher score is better.

In April 2010, Mr. Ellison's store had the second highest percentage sales increase from the year before in the district. On May 4, 2010, Mr. Weiskirch gave Mr. Ellison a letter of concern naming three areas of concern: commercial sales, store appearance, and store operations (specifically, outside purchase invoices piling up).

A few weeks later, on June 13, 2010, an O'Reilly Automotive regional sales manager recognized Mr. Ellison's store sales in an email to him stating, "Kurt, good job. Your hard work and persistence is finally paying off at Ashby's [a commercial customer] and some others." On July 1, 2010, Mr. Weiskirch emailed the store managers in his district congratulating six stores for record June sales. In the email, he highlighted store 1216's successful 21% increase over the previous year's same-month sales and its highest retail sales in the district despite having the worst retail location. Mr. Weiskirch also noted that store 1216 was one of only four stores in the district to show growth in commercial sales.

The next day, on July 2, 2010, Mr. Weiskirch emailed Mandy Spigle, a member of O'Reilly Automotive's Human Resources Department, about Mr. Ellison and attached the May

letter of concern. The email was copied to Chuck Kaiser, the regional manager and Mr. Weiskirch's supervisor. Mr. Weiskirch first discussed Mr. Ellison's performance, specifically noting commercial sales were strong in the previous month with a gain of $10K over previous year in same month and improvement of attention to detail to outside purchase invoices. Mr. Weiskirch then discussed a complaint by an exiting employee, Becky Turner, that Mr. Ellison was a poor leader. Specifically, she had complained that Mr. Ellison would take lunches and go out on sales calls while other employees were not able to go to lunch. Mr. Weiskirch then raised concern about Mr. Ellison's "paulsy[sic] or MS type disease:"

> Another area of concern this TM [team member] brought up was Kurt's physical ability to do the job. Kurt has some sort of paulsy[sic] or MS type disease. He wears braces on his legs to assist with his walking and his speech is impeded. Kurt has had this for a long time during his employment with us, but it seams[sic] to have worsened over the last couple of years. We have noted him falling down on several occasions and complaints have been received from customers stating they can't understand his speech. Basically, I'm not sure of when or if we could be looking at issuing a fitness for duty form. Mandy, in close we feel we are compromised right now with this manager, but are unsure of how to proceed. Any recommendation is appreciated.

At the time of this email, O'Reilly Automotive had no documentation of customer complaints about Mr. Ellison's speech or his falling in the store.

In response to this email, Ms. Spigle contacted Jodi Beck, another member of HR, who was responsible for working with employees with non-work-related medical conditions that may impact job performance. That same day, Ms. Beck contacted Mr. Weiskirch, and he told her that Mr. Ellison had a condition since the early 1990s that affects his speech, his speech was getting worse, customers can't understand him, and he was falling in the store. Ms. Beck advised Mr. Weiskirch that they needed to have a conversation with Mr. Ellison about the effect his speech is having on operations and look for a solution or accommodation and that they needed to discuss whether a fitness for duty form was necessary.

4

A few days later, Ms. Beck, Ms. Spigle, Mr. Weiskirch, and Mr. Kaiser had a conference call to discuss Mr. Ellison's performance and "medical issues." Regarding performance, the group decided to issue an addendum to the letter of concern addressing morale and communication with team members. Regarding her "ADA conclusions," Ms. Beck advised that after job performance issues have been addressed, they should sit down with Mr. Ellison to address concerns about his falling and to provide him a fitness for duty form. On July 7, 2010, Mr. Weiskirch gave Mr. Ellison an amended letter of concern addressing commercial sales, store appearance, and leadership.

On August 3, 2010, Mr. Weiskirch emailed his district managers and noted that six of the ten stores had increases in sales for July. Mr. Ellison's store 1216 had the highest sales increase in the district of 17.9%.

On August 24, 2010, Mr. Weiskirch placed Mr. Ellison on 90-day probation and noted three areas of concern: store appearance, leadership, and a new area of "employee training compliance."

On October 1, 2010, Mr. Weiskirch emailed his district managers about September store sales and noted that Mr. Ellison's store had the second highest increase in the district of 15%. Three days later on October 4, 2010, Mr. Weiskirch emailed Ms. Spigle and Mr. Kaiser and stated that Mr. Ellison "continues to struggle" and had "completely lost his team" and asked for approval to demote. He noted good sales but struggles in store appearance. Around this same time, Mr. Weiskirch met with Khyla Bailey, an employee in Mr. Ellison's store. He asked Ms. Bailey if she felt Mr. Ellison was a good leader and whether he could keep up with his management duties. Ms. Bailey replied that she did and that she did not see any areas of concern

5

regarding Mr. Ellison's management. Mr. Weiskirch also asked Ms. Bailey if she had ever seen Mr. Ellison fall, and she said that she had not.

On November 3, 2010, Mr. Weiskirch and Mr. Kaiser told Mr. Ellison that he was being demoted. Mr. Weiskirch did not explain to Mr. Ellison why he was being demoted, and he did not document anything about the conservation with Mr. Ellison. During the meeting, Mr. Ellison asked if he could stay on as an assistant manager or in an ISS position but was told that he could not because those were leadership positions. The next day, Mr. Weiskirch, Mr. Kaiser, and Ms. Beck had a conference call with Mr. Ellison. Ms. Beck asked Mr. Ellison whether he had any limitations or accommodation requests, and he replied that he did not.

On November 7, 2010, O'Reilly Automotive officially demoted Mr. Ellison from his store manager position to a parts specialist position. Mr. Ellison testified that the parts specialist position is more physically demanding than the store manager position and that he has no problems performing the essential functions of that position. Mr. Weiskirch testified that there were two main reasons for the demotion: leadership and overall condition of the store. Mr. Ellison's demotion resulted in a significant pay cut. As a store manager, he earned a salary plus commissions, bonuses, and stock options. As a parts specialist, he earns $12 an hour and has not had a raise since his demotion.

After Mr. Ellison was demoted, he was asked to take a Fitness for Duty medical exam. He did and was cleared to do anything at the store that he needed to do. Also after Mr. Ellison's demotion, HR directed Mr. Weiskirch to document occurrences with Mr. Ellison on the job. Mr. Weiskirch sent an email to HR on November 24, 2010, listing the following: customer not being able to understand Mr. Ellison (November 8, 2010); Mr. Ellison dropped a strut assembly (November 10, 2010); coworker heard Mr. Ellison fall while mopping (November 12, 2010); and

6

Mr. Ellison had fallen backwards at the counter (November 15, 2010). Ms. Beck responded to the email the same day saying that Mr. Ellison "is now a safety issue."

In March 2011, Mr. Ellison sent a letter to HR complaining that he thought his demotion was because of his disability. Thereafter, he filed a charge of discrimination with the Equal Employment Opportunity Commission and the Missouri Commission on Human Rights. Sometime after these charges, HR directed Mr. Weiskirch to document instances of customer complaints about not being able to understand Mr. Ellison on the phone during the time when he was a store manager. Per HR's directive, Mr. Weiskirch asked Dan Neal, the territory sales manager who serviced the commercial customers of the store managed by Mr. Ellison, to provide such a list of customers. Mr. Neal assumed the request was made for "a legal issue" because he could think of no other reason for it. On April 20, 2011, Mr. Neal faxed Mr. Weiskirch a list of three customers with such complaints.

Mr. Ellison brought this suit under the MHRA. He alleged that his disability was a contributing factor in O'Reilly Automotive's decision to demote him from store manager to a lower-level parts specialist position. O'Reilly Automotive moved to bifurcate the trial under section 510.263, and the request was unopposed.

Mr. Ellison, Mr. Weiskirch, and Ms. Beck all testified that Mr. Ellison's physical impairments related to his disability did not interfere with his job performance as store manager and that he could perform all of the essential job functions of that position. Mr. Ellison did not need any accommodations to perform his job as store manager and never asked for any. Mr. Weiskirch, Ms. Beck, and Ms. Spigle all acknowledged that discrimination is wrong and that treating disabled employees differently in the terms or conditions of their employment is illegal.

7

Mr. Ellison testified that his store was understaffed through much of 2010. He also testified that with the high level of retail business that the store was doing all day, it was difficult to find time to straighten and dust shelves. He said that he asked Mr. Weiskirch for help with these issues but that Mr. Weiskirch responded that the store was adequately staffed and that he would need to resolve the cleanliness issues on his own. Mr. Ellison explained that he did not get the support from Mr. Weiskirch that he needed to run the store and that Mr. Weiskirch set unattainable goals. Former employees, Ms. Bailey and Ms. Turner, also testified that they felt the store was understaffed.

Mr. Ellison further testified that he was aware at times that some customers had trouble understanding him on the phone. He explained that when he felt it was a concern, he would go to the customer and make certain their needs were met. He explained that it helped to meet the customer face-to-face because they could understand him better and that understanding would transfer back to the phone.

Mr. Ellison also testified that he has felt worthless and depressed since the demotion in 2010. His wife testified that after the demotion, Mr. Ellison became depressed, stopped functioning as a parent, and withdrew from the family. Mr. and Mrs. Ellison also testified that the change in Mr. Ellison's hours causes him to miss a lot of the family and children's activities that he was able to do before.

Finally, Mr. Ellison presented evidence regarding the performance reviews and discipline of other store managers in the same district between 2008 and 2012. Like in Mr. Ellison's 2010 review, five store managers received an overall rating of "needs improvement" during that time. All had similar ratings in the individual categories as Mr. Ellison. One of these store managers was placed on a 90-day probation. When he failed to improve in some of the areas of the first

8

probation, he was put on a second 90-day probation. He was not demoted. Another store manager, who Mr. Weiskirch noted in the review had lost the confidence of his team and his sales customers, was demoted from a store manager to an assistant store manager. The other three store managers who received similar performance reviews did not receive a letter of concern, were not put on probation, and were not demoted. Mr. Ellison also introduced evidence that another store manager in the district had been put on probation after failing a store audit in 2008. While on probation, he was accused of making a sexual reference to a new employee. He was not demoted but transferred to the store manager position of another store. Finally, Mr. Ellison presented evidence of the store audit scores of other stores in 2010. Three other stores in the district had lower scores than Mr. Ellison's 87, and four other stores had similar scores to his store in the 86 to 89 range. None of the other managers were demoted.

In stage one of the trial, the jury found that O'Reilly Automotive was liable for disability discrimination, awarded compensatory damages of $200,000, and found that O'Reilly was liable for punitive damages. In stage two, the jury awarded punitive damages in the amount of $2,000,000. Accordingly, the trial court entered judgment in favor of Mr. Ellison and also awarded front pay of $40,297.45 and attorney's fees/costs of $200,411.92 for a total award of $2,440,709.37. This appeal by O'Reilly Automotive followed.

<b>Submissibility of Punitive Damages</b>

In the first point addressed on appeal, O'Reilly Automotive contends that the trial court erred in submitting punitive damages to the jury because Mr. Ellison failed to show that its conduct was outrageous because of an evil motive or reckless indifference to the rights of others.

Section 213.111, RSMo 2000, permits the recovery of punitive damages in an action brought under the MHRA. *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc

2009). Whether there was sufficient evidence for an award of punitive damages is a question of law. *Howard v. City of Kansas City*, 332 S.W.3d 772, 788 (Mo. banc 2011). "A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted 'either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred).'" *Id.* (quoting *Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 635 (Mo. banc 2004)). In determining whether the evidence was sufficient to submit the claim for punitive damages, the evidence and all reasonable inferences are viewed in the light most favorable to submissibility. *Id.* A submissible case is made if the evidence and inferences are sufficient to allow a reasonable juror to conclude that it is highly probable that the defendant's conduct was outrageous because of evil motive or reckless indifference. *Id.*

"The defendant must have intentionally committed a wrongful act without just cause or excuse." *Id.* (internal quotes and citation omitted). If the defendant intentionally does a wrongful act and knows at the time the act is wrongful, it is done wantonly and with a bad motive. *Beggs v. Universal C.I.T. Credit Corp.*, 409 S.W.2d 719, 722-23 (Mo. 1966); *Claus v. Intrigue Hotels, LLC,* 328 S.W.3d 777, 783 (Mo. App. W.D. 2010), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013). Evil intent may also be implied from reckless disregard of another's rights and interests. *Beggs*, 409 S.W.2d at 723; *Claus*, 328 S.W.3d at 783. Punitive damages awards have been upheld when the court found management participated in the discriminatory conduct and treated the plaintiff differently from others. *Claus,* 328 S.W.3d at 783. Most employment discrimination cases are inherently fact-based and necessarily rely on inferences rather than direct evidence. *Holmes v. Kansas City Missouri Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. App. W.D.

10

2012)(internal quotes and citation omitted). Direct evidence is not common in such cases because employers are shrewd enough to not leave a trail of direct evidence. *Id.* at 628-29. In the absence of direct evidence, a plaintiff may use circumstantial evidence to prove his case. *Id.* at 629.

"Proof offered to support an employee's underlying substantive claim and the employee's additional claim for punitive damages need not be mutually exclusive, and often is not." *Claus*, 328 S.W.3d at 783 (internal quotes and citation omitted). In this case, Mr. Ellison was required to submit evidence allowing a reasonable fact-finder to conclude that his disability was a contributing factor in O'Reilly Automotive's decision to demote him. *Id.* at 782-783 (if consideration of age, disability, or other protected characteristics contributed to unfair treatment, that is sufficient to prove discrimination under the MHRA). *See also Hurst v. Kansas City Missouri School Dist.*, 437 S.W.3d 327, 339 (Mo. App. W.D. 2014)("A plaintiff can prove discrimination by showing age or any protected characteristics was a contributing factor for the employment action regardless if other factors also exist."). Evidence that meets this burden may potentially allow a reasonable juror also to conclude that the defendant acted with evil motive or reckless indifference. *Claus*, 328 S.W.3d at 783.

Such is the case here. The evidence showed that every O'Reilly Automotive management and HR employee involved in the decision to demote Mr. Ellison was aware of his disability prior to his demotion. O'Reilly Automotive has policies in place that prohibit discrimination, and Mr. Weiskirch, Mr. Ellison's supervisor, and Ms. Beck and Ms. Spigle of HR acknowledged at trial that treating disabled employees differently in the terms or conditions of their employment is illegal. Ms. Beck and Ms. Spigle further agreed that it would be wrong if one of the reasons that an employer demotes an employee is the employee's disability. Mr.

11

Ellison, Mr. Weiskirch, and Ms. Beck all testified that Mr. Ellison's disability did not interfere with his job performance as store manager. Mr. Ellison never asked for any accommodation to perform his job—he didn't need any accommodations. O'Reilly Automotive demoted Mr. Ellison to a parts specialist position, which is physically more demanding than the store manager position. Mr. Ellison was able to perform all of the essential job functions of both positions. Yet O'Reilly Automotive management and HR discussed and considered Mr. Ellison's disability during the time he was being disciplined and ultimately demoted. Mr. Weiskirch first raised concern over Mr. Ellison's "paulsy [sic] or MS type disease" in an email to HR and his supervisor on July 2, 2010. Four days later, members of HR and management had a conference call and discussed Mr. Ellison's "medical issues" and decided to draft an amended letter of concern.

At trial, O'Reilly maintained that it did not demote Mr. Ellison because of his disability but instead because of his performance. Mr. Weiskirch testified that that there were two main reasons for the demotion: leadership and overall condition of the store. A reasonable juror could have concluded, however, that these stated reasons for the demotion were pretexual and that O'Reilly Automotive's conduct was outrageous because of evil motive or reckless indifference. The record demonstrated that O'Reilly Automotive's reasons for Mr. Ellison's discipline leading up to his demotion changed over time. The first letter of concern in May 2010 listed commercial sales, store appearance, and store operations. Two months later, these areas of concern were corrected except for store appearance. On July 7, 2010, one day after the conference call with HR wherein Mr. Ellison's disability was discussed, Mr. Weiskirch gave Mr. Ellison an amended letter of concern addressing different issues than before including leadership. On August 24, 2010, Mr. Weiskirch placed Mr. Ellison on a 90-day probation with approval of his supervisor,

12

Mr. Kaiser. The stated concerns then included two new categories, store morale and employee training compliance. Thirty-four days into the 90-day probation, Mr. Weiskirch asked for approval to demote Mr. Ellison.

Furthermore, during the time of his discipline, Mr. Ellison's store had consistently good sales, which, Mr. Weiskirch testified, was O'Reilly Automotive's most important business objective. In April 2010, his store had the second highest percentage sales increase in the district. On both June 13 and July 1, 2010, Mr. Ellison was recognized for his store sales despite having the worst retail store location in the district. On August 3, 2010, Mr. Weiskirch noted that Mr. Ellison's store had the highest sales increase in the district for the month of July; and October 1, 2010, he noted that Mr. Ellison's store again had the second highest sales increase in the district for September.

Significantly, Mr. Ellison's performance reviews were similar to those of other store managers in the district who were not demoted out of leadership positions. Some were not disciplined at all—they did not receive letters of concern and were not placed on probation or demoted. Another store manager that was put on probation was given more time than Mr. Ellison to correct his performance issues. And the other store manager that was demoted was demoted to an assistant manager position, which Mr. Ellison requested but was denied. Similarly, the 2010 store audits for the district showed that three stores had a lower audit score and four other stores had similar scores than Mr. Ellison's store. None of those store managers was demoted.

Finally, O'Reilly Automotive's conduct after the demotion further supported the submission of punitive damages. Although O'Reilly denied that Mr. Ellison was demoted because of his disability, it began to gather documentation after the demotion of customer

13

complaints about Mr. Ellison's speech and about his falling in the store. Dan Neal, the territory sales manager who was directed by Mr. Weiskirch to gather such evidence, testified that he assumed the request was made for "a legal issue" because he could think of no other reason for it. O'Reilly Automotive also asked Mr. Ellison to take a Fitness for Duty medical exam after his demotion. He did and was cleared to do anything at the store that he needed to do.

All of these facts constitute clear and convincing evidence sufficient to allow a reasonable jury to find that it was highly probable that O'Reilly Automotive's conduct was outrageous because of an evil motive or reckless indifference. Accordingly, the trial court did not err in submitting punitive damages to the jury. The point is denied.

**Verdicts**

In the next point on appeal, O'Reilly Automotive contends that the trial court erred in denying its motion for new trial because the punitive damages award was not rendered by three-fourths of jurors as required by Article I, section 22 of the Missouri Constitution and section 494.490, RSMo 2000. Article I, section 22(a) of the Missouri Constitution and section 494.490 provide that three-fourths or more jurors may return a lawful verdict. In *Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 924 (Mo. banc 1992), *abrogated on other grounds by Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. banc 2008), the Missouri Supreme Court stated that in a case where nine or more jurors must agree on a verdict, the same nine jurors must agree upon all elements necessary for a verdict for or against any particular party claiming damages. *See also State ex rel. Boyer v. Perigo*, 979 S.W.2d 953, 956 (Mo. App. S.D. 1998). The same nine jurors that agree upon liability must also agree on the amount of damages. *Stacy*, 836 S.W.3d at 924; *Boyer*, 979 S.W.2d at 956. O'Reilly Automotive argues that because only seven of the twelve

14

jurors agreed on both the issue of punitive damages liability and the amount of punitive damages, the verdict was invalid.

In this case, O'Reilly requested a bifurcated trial pursuant to section 510.263, RSMo Cum. Supp. 2013. The request was unopposed, and the trial was bifurcated. The procedure for a bifurcated trial where punitive damages are involved is set out in section 510.263:

> 1. All actions tried before a jury involving punitive damages, including tort actions based upon improper health care, shall be conducted in a bifurcated trial before the same jury if requested by any party.
>
> 2. In the first stage of a bifurcated trial, in which the issue of punitive damages is submissible, the jury shall determine liability for compensatory damages, the amount of compensatory damages, including nominal damages, and the liability of a defendant for punitive damages. Evidence of defendant's financial condition shall not be admissible in the first stage of such trial unless admissible for a proper purpose other than the amount of punitive damages.
>
> 3. If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant. Evidence of such defendant's net worth shall be admissible during the second stage of such trial.

Section 510.263 requires the same twelve-person jury to determine all issues in both stages of the bifurcated trial. The procedures of section 510.263 were followed in this case, and standard MAI instructions for a MHRA case were given.

Specifically, Instruction No. 5, patterned after MAI 2.04, provided in relevant part, "Nine or more of you must agree in order to return any verdict. A verdict must be signed by each juror who agrees to it." Instruction No. 6, which was submitted by O'Reilly Automotive and patterned after MAI 38.01(B), submitted liability for disability discrimination. Instruction No. 7, submitted by Mr. Ellison and patterned after MAI 4.01, was given as the standard compensatory damages instruction. Instruction No. 8, submitted by Mr. Ellison and patterned after MAI 10.01 and modified by MAI Illus. 35.19, which provides guidance for the submission of punitive

15

damages in a bifurcated trial under section 510.263, was given as the standard punitive damages liability instruction. Verdict A, MAI 36.11 modified by MAI Illus. 35.19, was the standard liability verdict form. It allowed the jury to find in favor of either Mr. Ellison or O'Reilly Automotive on Mr. Ellison's claim of disability discrimination against O'Reilly Automotive, assess the compensatory damages, and find O'Reilly Automotive liable or not liable for punitive damages.

In the first stage of the trial, the jury returned Verdict A finding O'Reilly Automotive liable for compensatory damages, assessing compensatory damages at $200,000, and finding O'Reilly Automotive liable for punitive damages. Ten of the twelve jurors signed Verdict A. During stage two, a stipulation of the parties was read to the jury that O'Reilly Automotive has assets in excess of $100 million. Instructions No. 9 and 10, submitted by Mr. Ellison, were then read to the jury. Instruction No. 9 instructed that it, Instruction No. 10, and general instruction 1 through 5 would apply to determine the amount of punitive damages and that the jury would use Verdict Form B. Instruction No. 10, MAI 10.04 and modified by MAI Illus. 35.19, was the standard punitive damages instruction. Verdict B, not in MAI and modified by MAI Illus. 35.19, allowed the jury to assess punitive damages. The jury returned Verdict B assessing $2 million in punitive damages against O'Reilly Automotive. Nine of the twelve jurors signed Verdict B. Two of the nine jurors who signed Verdict B did not sign Verdict A.

O'Reilly Automotive argues that, as a result, only seven of the twelve jurors agreed on the issue of punitive damages liability and the amount of punitive damages, therefore, the verdicts were inconsistent and invalid under the general rule that nine of twelve jurors must agree on both liability and damages. It did not, however, object to the verdict forms at trial. "If a party disagrees with a verdict form, 'specific objections must be made at the time the verdict

16

forms are given to the jury.'" *Mackey v. Smith*, 438 S.W.3d 465, 475 (Mo. App. W.D. 2014) (quoting *Stacy*, 836 S.W.2d at 924). Similarly, it did not object when the verdicts were announced and accepted or before the jury was discharged. "[A] claim that a verdict is inconsistent to the point of being self-destructive must be presented to the trial court before the jury is discharged or that claim is waived." *Lindahl v. State*, 359 S.W.3d 489, 493 (Mo. App. W.D. 2011)(internal quotes and citation omitted).

Regardless, the general rule is not applicable where the jury is required to return more than one verdict. *Kemp v. Burlington Northern R. Co.*, 930 S.W.2d 10, 12 (Mo. App. E.D. 1996). "[W]here there are multiple counts and multiple defendants, a different group of nine jurors can agree to all of the elements of each respective count. *Mackey*, 438 S.W.3d at 474 (where division of jurors in three verdicts regarding two physician defendants in medical malpractice case met requirement that at least nine jurors agree on each element of a particular claim against a particular defendant including the amount of damages). The Eastern District explained in *Kemp*, "As to each count nine jurors were required to agree on both liability and damages. That could have been two different groups of nine on each count, but for each count the same nine had to agree on liability and damages." 930 S.W.2d at 12.

Additionally, in *Powell v. Norman Lines, Inc.*, 674 S.W.2d 191, 199 (Mo. App. E.D. 1984), the Eastern District held that if nine jurors agree to liability and the amount of damages, a different nine jurors may apportion fault among the defendants. It reasoned, "To hold otherwise would be to prohibit jurors who dissent on the question of a party's liability from participation in the important remaining issue of allocating responsibility among the parties, a result that would deny all parties the right to a jury of 12 persons deliberating on all issues." *Id.* (internal quotes and citation omitted). The Missouri Supreme Court in *Stacy* found that the result in *Powell* was

correct because the apportionment of fault claim was a separate claim from the plaintiff's main claim. *Stacy*, 836 S.W.2d at 924.

In this case, the two stages of the bifurcated trial created separate jury issues. *Litchfield By and Through Litchfield v. May Dept. Stores Co.*, 845 S.W.2d 596, 598-99 (Mo. App. E.D. 1992)(evidence of the independent and separable nature of punitive damages is found in the bifurcation statute, section 510.263). "'Punitive damages are mere incidents to the cause of action and are considered separate and apart from and in addition to the assessment of [compensatory] damages.'" *Id.* (quoting *Holcroft v. Missouri-Kansas-Texas R.R. Co.*, 607 S.W.2d 158, 163 (Mo. App. W.D. 1980)). "Compensatory damages and punitive damages serve separate purposes." *Mansfield v. Horner*, 443 S.W.3d 627, 643 (Mo. App. W.D. 2014). "While compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct,' punitive damages 'are aimed at deterrence and retribution.'" *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). The justification for the bifurcation of the issues of liability and punitive damages is to avoid prejudice. Section 510.263.2 excludes evidence of the defendant's financial condition during the first stage of trial.

> What our system does is initially shield the evidence of the defendant's wealth from the jury, until there has been a determination that the defendant's conduct merits punitive damages. One commentator has mused, "It is a good guess that rich men do not fare well before juries, and the more emphasis placed on their riches, the less well they fare."

*Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 654 (Mo. App. W.D. 1997) *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013)(quoting Morris, Punitive Damages in Tort Cases, 44 Harvard Law Review 1173, 1191 (1931)).

18

Moreover, the verdict forms in MAI Illus. 35.19 for the submission of punitive damages in a bifurcated trial provide for separate sets of signatures by jurors for the return of the verdict in the first stage of the trial for determination of liability for compensatory damages, the amount of compensatory damages, liability of a defendant for punitive damages and the return of the verdict in the second stage for the assessment of punitive damages. *Stacy*, 836 S.W.2d at 924. If nine jurors agree on liability for compensatory damages, the amount of compensatory damages, and liability of a defendant for punitive damages in the first stage of the bifurcated trial, then any nine jurors may decide the amount of punitive damages in the second stage. To hold otherwise would forbid jurors who disagreed with the majority on the issues in the first stage from deliberating on the important remaining issue of amount of punitive damages. Such result would deny all parties the right to a jury of twelve persons deliberating on all issues and needlessly complicate our system of trial by jury. *Mackey*, 438 S.W.3d at 474; *Powell*, 674 S.W.2d at 199. Indeed, a defendant would want a juror who did not believe it was liable for compensatory and punitive damages in the first stage to be able to present an argument to fellow jurors during deliberations against a high punitive damages award. "A contrary holding would also cause economic loss to the public, litigants, and attorneys because of mistrials and would further court congestion and unfairness resulting from prolonged delay." *Powell*, 674 S.W.2d at 199. The punitive damages verdict was valid, and the trial court did not err in denying O'Reilly Automotive's motion for new trial. The point is denied.

## Remittitur of Punitive Damages

In its final point on appeal, O'Reilly Automotive contends that the trial court erred in failing to order remittitur of the jury's punitive damages award. It argues that remittitur was

appropriate under section 510.263, RSMo Cum. Supp. 2013, because the award was excessive in light of the facts of the case and punitive damages awards in other cases.[1]

"Generally, the decision to award punitive damages is peculiarly committed to the jury and the trial court's discretion, and the appellate court will only interfere in extreme cases." *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 810 (Mo. App. W.D. 2008)(internal quotes and citation omitted). Section 510.263.6 allows the trial court to order remittitur of punitive damages "based on the trial judge's assessment of the totality of the surrounding circumstances."

> As with a compensatory-damage award, the trial court has broad discretion to remit a punitive-damage award if, "after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages."

*Blanks v. Fluor Corp.*, 450 S.W.3d 308, 412 (Mo. App. E.D. 2014) (quoting §537.068, RSMo 2000). "On appellate review, an abuse of discretion is established when the punitive damages award is so disproportionate to the factors relevant to the size of the award that it reveals improper motives or a clear absence of the honest exercise of judgment." *Call v. Heard*, 925

---

[1] In the argument section of this point, O'Reilly Automotive cites *State Farm Mutual Insurance Co. v. Campbell*, 538 U. S. 408, 417 (2003), and other federal cases, which provide that a grossly excessive punitive damages award violates a tortfeasor's substantive due process rights. In determining whether a punitive damages award comports with due process, three guideposts are reviewed: (1) the reprehensibility of the defendant's misconduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 410 (Mo. App. E.D. 2014) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996)). In its post-trial motion and in its point relied on, O'Reilly argues for a reduction in punitive damages based on statutory remittitur rather than a reduction based on due process constitutional grounds. Although both potentially achieve the same result, statutory remittitur and a constitutionally reduced verdict are in theory different. *Id.* at 412 n.71. A court orders a remittitur when it finds that the jury's award is excessive and unreasonable on the facts. *Id.* "A constitutional reduction, on the other hand, is a determination that the law does not permit the award." *Id.* O'Reilly Automotive did not raise a constitutional due process claim below or in its point relied on here, therefore, any constitutional challenge it attempts to raise in the argument portion of its brief was not preserved for appellate review. *See Dooms v. First Homes Sav. Bank*, 376 S.W.3d 666, 679 (Mo. App. S.D. 2012) (where defendants did not raise constitutional challenge to punitive damages award in post-trial motion, it was not preserved for appellate review). Regardless, even if reviewed under the constitutional criteria of *State Farm* and *Gore*, the facts of this case warranted the punitive damages award as discussed below.

S.W.2d 840, 849 (Mo. banc 1996)(internal quote and citation omitted). Only when the amount of punitive damages is manifestly unjust will an appellate court interfere with or reduce the size of the verdict. *Smith*, 275 S.W.3d at 810.

No bright-line test exists to determine whether a punitive damages award is excessive. *Blanks*, 450 S.W.3d at 412. Such awards are evaluated on a case-by-case basis. *Id.* at 413. "Punitive damages are intended to punish outrageous conduct and deter a future occurrence of similar conduct." *Lynn v. TNT Logistics North America Inc.*, 275 S.W.3d 304, 311 (Mo. App. W.D. 2008). "[T]he amount of punitive damages must somehow be related to the wrongful act and the actual or potential injury resulting therefrom, although there is no fixed mathematical relation between the amount of actual damages and the amount of punitive damages awarded." *Call*, 925 S.W.2d at 849. Missouri courts have identified a nonexclusive list of factors to consider in determining whether the trial court abused its discretion in denying remittitur of a punitive damages award:

> (1) the degree of malice or outrageousness of the defendant's conduct, which has been deemed a critical factor; (2) aggravating and mitigating circumstances; (3) the defendant's financial status, as an indication of the amount of damages necessary to punish the defendant; (4) the character of both parties; (5) the injury suffered; (6) the defendant's standing or intelligence; (7) the age of the injured party; and (8) the relationship between the two parties.

*Blanks*, 450 S.W.3d at 413 (citing *Call*, 925 S.W.2d at 849; *Smith*, 275 S.W.3d at 811). On review, the evidence is viewed in the light most favorable to the trial court's decision. *Id.* (citing *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39 (Mo. banc 2013).

Here, Mr. Ellison was awarded $200,000 in compensatory damages and $2,000,000 in punitive damages. O'Reilly Automotive's actions in demoting Mr. Ellison were outrageous. During the time Mr. Ellison was being disciplined and ultimately demoted, he was repeatedly recognized for good sales and his performance reviews were similar to those of other store

21

managers who were not demoted out of leadership positions. Despite performing his job well, O'Reilly Automotive management and HR discussed and considered Mr. Ellison's disability in demoting him to a parts specialist position, which is physically more demanding than the store manager position. Mr. Ellison went from earning a salary plus commissions, bonuses, and stock options to earning $12 an hour as a parts specialist and has not had a raise since his demotion. O'Reilly Automotive's demotion of Mr. Ellison was at a minimum reckless misconduct. Based on the standard of review and comparable cases, the jury's award of punitive damages was not manifestly unjust in this case. *See Bowolak v. Mercy East Communities*, 2014 WL 5470262 (Mo. App. E.D. 2014)(in disability discrimination case, the Eastern District approved a punitive damages award of $500,000 with $50,000 in actual damages); *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 213-14 (Mo. App. W.D. 2013)(in MMPA case, this court approved a punitive damages award of $881,789.05 with actual damages totaling $176,357.81); *Lynn*, 275 S.W.3d at 310 (in sexual harassment case, the jury awarded $50,000 in compensatory damages and $6.75 million in punitive damages, which the trial court remitted to $450,000; this court held that trial court remittitur was too low to attain purposes of punitive damages and increased the punitive damages award to $3.75 million). O'Reilly Automotive is a large corporation employing 62,000 people with assets in excess of $100 million. The $2 million award accomplished the purposes of punitive damages and was related to the wrongful act. The trial court did not err in failing to order remittitur of the jury's punitive damages award. The point is denied.

22

The judgment is affirmed.[2]

_____
VICTOR C. HOWARD, JUDGE

All concur.

---

[2] Mr. Ellison timely filed a motion for attorneys' fees on appeal under section 213.111.2, RSMo 2000, and the motion was taken with the case. Section 213.111.2 allows a court to "award court costs and reasonable attorney fees to the prevailing party" in a human rights action. *See also Claus*, 328 S.W.3d at 789. The award of costs and attorneys' fees authorized by the statute was meant to fully compensate for the costs of prosecuting the matter to final judgment. *Claus*, 328 S.W.3d at 789. "This includes any reasonable hours spent and expenses incurred in connection with an appeal of the judgment below." *Id.* Accordingly, Mr. Ellison's motion for attorneys' fee on appeal is granted. While this court has expertise on the subject of appellate attorneys' fees and authority to enter an award, the trial court is also considered an expert on the subject of attorneys' fees. *Id.* Moreover, it is generally in a better position to take evidence and hear argument on the issue. *Id.* The case is, therefore, remanded to the trial court for an award of reasonable attorneys' fees on appeal.